Docket No. 97373.

**IN THE**
**SUPREME COURT**
**OF**
**THE STATE OF ILLINOIS**

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
CURTIS A. THOMPSON, Appellant.

*Opinion filed April 10, 2006.*

CHIEF JUSTICE THOMAS delivered the judgment of the court,
with opinion.

Justices Freeman, Garman, and Karmeier concurred in the
judgment and opinion.

Justice Fitzgerald specially concurred.

Justice McMorrow dissented with opinion.

Justice Kilbride took no part in the decision.

**OPINION**

Following a jury trial in the circuit court of Stark County,
defendant, Curtis A. Thompson, was convicted of three counts of first
degree murder (720 ILCS 5/9−1(a) (West 2002)) for killing three
persons. Defendant was also convicted of one count of home invasion
(720 ILCS 5/12−11(a)(5) (West 2002)), two counts of attempted first
degree murder (720 ILCS 5/9−1(a), 8−4(a) (West 2002), three counts
of aggravated discharge of a firearm (720 ILCS 5/24−1.2(a)(3) (West
2002)), one count of disarming a police officer (720 ILCS 5/31−1a
(West 2002)), and one count of criminal damage to property (720
ILCS 5/21−1(1)(a) (West 2002)). Defendant thereafter waived his

right to a jury at sentencing. Following a death penalty hearing, the trial court found defendant eligible for the death penalty based on three factors: defendant had murdered a police officer, he had murdered two or more persons, and two of the murders had occurred during the course of a home invasion. After hearing evidence in aggravation and mitigation, the trial court concluded that there were no mitigating factors sufficient to preclude imposition of the death penalty. Accordingly, the trial court sentenced defendant to death on each of the first degree murder convictions. The trial court also sentenced defendant to terms of imprisonment of 50 years on each of the attempted murder convictions, 30 years for home invasion, 15 years for aggravated discharge of a firearm, and 3 years for criminal damage to property, all sentences to run concurrently. The court did not impose sentence on two of the aggravated discharge of a firearm counts, finding that it was precluded from doing so by the one-act, one-crime rule. Defendant's appeal was brought directly to this court because he was sentenced to death. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603.

Defendant does not challenge the sufficiency of the evidence to convict him, and he raises no issues with respect to the guilt/innocence phase of his trial. Instead, defendant raises three issues challenging his sentence. The first issue contests his death sentence as being excessive in light of the aggravation and mitigation presented at the penalty phase of his sentencing hearing. Defendant's two remaining issues pertain to the constitutionality of the death penalty.

BACKGROUND

We have thoroughly reviewed the record in this case. Because the resolution of the principal issue raised is largely dependent on the weight of the evidence in aggravation and mitigation, we will set forth a comprehensive summary of the evidence adduced at defendant's lengthy trial and sentencing proceedings.

At the guilt phase of defendant's trial, the State presented testimony showing that defendant armed himself with a sawed-off shotgun and went on a shooting spree, first killing a police officer and then two neighbors in the presence of their 10-year-old daughter. After killing the officer and two neighbors, defendant drove through

˘2˘

town and engaged other police officers in a low-speed chase before opening fire on the officers.

Shirley Brown was the first witness called by the State at defendant's trial. She testified that on the evening of March 22, 2002, she was on duty in her employment as a dispatcher for the Stark County sheriff's department. Deputy Adam Streicher was also on duty that evening and in uniform. Streicher came to the station, checked the active warrant file and ran computer checks on outstanding warrants. Streicher left the station shortly after 7 p.m. in his squad car and began running license plate checks. At some point, he called Brown and asked for the phone number for defendant's residence. When records showed that the number was unavailable, Streicher asked Brown for information on an outstanding warrant against defendant. Brown informed Streicher that the percentage applied for the warrant required payment of $100. Streicher signed off and was never heard from again. Brown grew concerned for the deputy, but her repeated attempts to radio him for status were unavailing.

James Batey testified that around 7 p.m. on March 22, 2002, he stepped outside the front door of his house to watch a Stark County sheriff's deputy in a squad car run license-plate checks on vehicles parked on the street. The officer parked his squad car in front of defendant's house, which was one house over from Batey's house. Batey observed the officer standing at defendant's front door with his hands at his side. As Batey turned and opened the door to his house, he heard a loud shot that "sounded like an M-80." He then saw defendant look toward the ground and nudge something with his foot. At that point, Batey moved closer and established eye contact with defendant. Batey then ran into his house to put his shoes on. When he came back outside, he saw that the squad car that had been parked in front of defendant's house was now speeding toward the property of James and Janet Giesenhagen. Batey watched the squad car slam into the Giesenhagens' vehicle. Defendant emerged from the squad car, ran up to the door of the Giesenhagens' home with a rifle in hand, and kicked the door in. Batey then heard a woman scream, followed by a gunshot. As Batey ran to his house, he heard another gunshot. Batey then loaded his family into their van in order to evacuate the area. As they drove past defendant's house, they saw a slain sheriff's deputy lying in front of defendant's house.

Marilyn Giesenhagen testified that she is the 71-year-old mother of James Giesenhagen and that she lived across the alley from her son. Sometime around 7 p.m. on March 22, 2002, she received a phone call from her granddaughter Ashley Giesenhagen, who is the daughter of James and Janet. Ashley said, "grandma, come quick. Curt Thompson just killed my daddy and hurt my mommy." Marilyn then went to the home. She found Janet on the kitchen floor, with her hand "blown off" and having difficulty breathing. She found her son at the bottom of the basement stairs in a pool of blood.

Emergency Medical Technician Michael Jezierski testified that he was dispatched to the Giesenhagen home after receiving a call of a multiple shooting incident. Upon arrival, Jezierski found that James Giesenhagen had a large amount of blood around his head, had no pulse and was not breathing. After determining that James was beyond medical help, Jezierski turned to Janet and found that her hand was amputated at the wrist and she had suffered multiple puncture wounds to her left upper torso.

Jason Rice testified that on the night of the murders he was driving home after having had dinner with his parents. As Rice drove through town, a squad car deliberately collided with his truck. When Rice exited his truck to check the damage, he recognized defendant sitting in the squad car. Rice was afraid of defendant from his past experience with him. Rice explained that he used to live next door to defendant, and defendant had a habit of glaring at and trying to intimidate people in town. Sometimes defendant would follow Rice through town in his vehicle. On one occasion in August 2001, some people were spinning their tires on the road near Rice's home. Defendant came over to Rice's front porch and blamed him for the incident. Defendant then threatened Rice with a club and told Rice that he "would bury [him] in a pine box." Thus, on the night of March 22, 2002, Rice fled the scene of the collision with the squad car when he saw defendant sitting inside it. On cross-examination, Rice admitted that he had lit off a bottle rocket near defendant's house before defendant came to Rice's porch on the night of their encounter in August 2001.

Bradford Police Officer Mark James testified that after hearing a radio report of gunshots at Deputy Streicher's last-known location, James went to that neighborhood and immediately encountered

defendant driving Streicher's vehicle. James put his vehicle in reverse, and the Streicher vehicle inched toward him at about five miles per hour. As this continued, it appeared at one point that defendant was going to ram James' vehicle. James picked up speed in reverse until other officers were in position; he then stopped in order to block the roadway. At that point, defendant rammed James' car. James exited his vehicle and slowly approached defendant, who could not be seen because of the now crumpled hood on Streicher's squad car. James repeatedly commanded defendant out of the vehicle, and on the third such command, defendant shot at James through the passenger side window. James took cover and returned fire. Within the next several minutes, other officers arrived at the scene to provide backup. Jimmy Dison, the Stark County chief deputy sheriff, eventually pulled defendant out of the squad car and handcuffed him.

Toulon Police Chief Robert Taylor testified that he and Officer Brian Rewerts responded to the scene and observed James' vehicle proceeding in reverse as it was being pursued by Streicher's squad car. Taylor and Rewerts were driving separate vehicles. They followed defendant as he drove toward James. When Officer James stopped in front of defendant, Taylor and Rewerts blocked the road from behind. Taylor exited his vehicle and observed defendant shooting at James. Taylor stood there for a couple of seconds, felt something strike him, and realized that he too was under attack. Taylor eventually placed himself in position for a clear shot at the top of defendant's head. Taylor fired one quick shot, and there was no more gunfire that night. Within a few seconds, Chief Deputy Dison arrived and pulled defendant from Streicher's vehicle.

On cross-examination, Chief Taylor noted that he had known defendant since at least 1993 because of defendant's prior contacts with the police department. Taylor explained that on a few occasions defendant had tailgated police officers or swerved his vehicle at them.

Brian Rewerts, an officer with the police department in Wyoming, Illinois, testified that he helped block the road from behind defendant. When Rewerts exited his vehicle, he realized that shots were being fired by defendant from Streicher's vehicle. Rewerts attempted to move his vehicle closer to defendant, but was unable to do so because his back tires had been shot out. Rewerts watched Dison remove a wounded defendant from the vehicle, along with a

sawed-off shotgun and handgun taken from defendant's lap. Rewerts noted that in addition to the damage to his tires, his vehicle had two gunshot holes in the passenger side doors.

Chief Deputy Jimmy Dison testified that after he disarmed defendant and removed him from the Stark County police vehicle, his thoughts turned to the plight of Deputy Streicher. Dison and the other officers ran to defendant's house and found Streicher's dead body lying on the ground in front of defendant's house outside the closed front door.

Dison further testified that in December of 2001, he went to defendant's home wearing his uniform and driving a marked squad car. On that occasion, Dison walked up to defendant and said, "Curt, we have got a warrant for you. It's a hundred dollars bond. I will give you a week to get the money and come up and post bond on the warrant." Initially, defendant did not respond, but as Dison turned to leave, defendant said, "you will have to come back and get me."

On cross-examination, Dison testified that the warrant was issued for the purpose of revoking probation for defendant's failure to pay court costs in a case in which defendant was convicted for assaulting Joe Tracey.

Lee Ellington, a nurse at St. Francis Hospital in Peoria, Illinois, testified that defendant was a patient in her care on March 30, 2002, eight days after the murders. At one point that day, defendant admitted that he had shot the victims. The next day, defendant told Ellington that "he didn't mean to shoot the woman, all she had to do was put a tourniquet on her arm but the bitch died anyway." Defendant also said that "a lot more people were going to get it when he got out." Later on that same day, defendant told Ellington that he was "sorry the child had to see it, but all she had to do was close her eyes." Defendant was not under any medication when he made these statements.

The forensic and crime-scene-investigation evidence revealed that Deputy Streicher died from a shotgun wound, delivered at close range to the neck and upper chest. Janet Giesenhagen died from a massive shotgun wound delivered at close range to her arms and chest that caused major damage to her entire upper torso and resulted in pellet fragments penetrating her chest and lungs and severing her right hand. James Giesenhagen died from a gunshot blast inflicted at

intermediate range to the face, neck and chest.

After concluding its case in chief, the State rested, and defendant raised an insanity defense. Defendant presented the testimony of a number of witnesses, along with two mental health experts–Drs. John Day and Robert Chapman–to support his defense. The State presented the psychiatric testimony of Dr. Andrew Kowalkowski to rebut the defense.

The defense first called Joseph Tracey, who testified that he began working for James Giesenhagen in the Giesenhagens' heating and air conditioning business about five years before the murders. Tracey's duties required him to sometimes work in an alley behind the Giesenhagens' home. Defendant would often drive past and stare hatefully at Tracey, even though Tracey himself never had any previous history with defendant. The Giesenhagens, however, did have a history with defendant, as they had filed a lawsuit against him some years earlier. On one of these occasions when defendant drove past, he yelled to Janet Giesenhagen that "they had better stop harassing him or he would get even."

Tracey recalled an incident where he was driving on a highway about seven miles southwest of Toulon, while looking for a location where he was to bid on a construction job. Defendant came down the road in his truck and began following Tracey. Defendant passed Tracey, blocked the intersection ahead, exited his truck and proceeded toward Tracey's vehicle, holding a hammer. Defendant told Tracey that he was "going to beat the shit out of [him]." Tracey eventually drove in the ditch around defendant's truck and continued on his way. He later called the sheriff's department to report the incident. Defendant was eventually brought to trial over the matter, convicted and ordered not to have any contact with Tracey. Nonetheless, about two months later, defendant began driving by Tracey's house and past him while he worked in the alley behind the Giesenhagen house.

Tracey also had two other encounters with defendant. In February of 2000, Tracey was shopping in a grocery store in Toulon. Defendant began following Tracey through the aisles, trying to intimidate him. Defendant then said to him, "You son of a bitch, you better stay out of my business or I am going to get you." In March 2002, defendant briefly blocked Tracey's van at an intersection in

downtown Toulon.

On cross-examination, Tracey stated that the Giesenhagens routinely left scrap metal and other business-related items in the back of their property. When defendant drove through the alley, he always stayed on the public way and never left his vehicle. With respect to the incident where defendant threatened Tracey with a hammer, Tracey acknowledged that he had had a hard time locating the job site and that he happened to drive past a piece of farm property defendant owned along the road. At the time, Tracey was driving a company van that identified the Giesenhagens' business. Defendant did not actually try to hit him or the van with the hammer, and defendant never attempted to run him off the road. Defendant was convicted for assault over the offense. At sentencing on the charge, the incident at the grocery store was brought up, and defendant was ordered to stay away from Tracey and his family and was placed on probation for two years. Tracey also acknowledged that defendant did not threaten or even speak to him at the grocery store until after Tracey asked to use the store phone to call the police.

Lonny Dennison testified that he was the Stark County sheriff for 20 years–from 1982 to 2002. Dennison noted that during that time, he had "dealings with defendant that went real well and *** dealings where we would have words back and forth. If it didn't go his way, then [defendant] was upset." Dennison further noted that people would get into confrontations with defendant and then come to the sheriff's office to complain. But most people did not want to sign a complaint. The Giesenhagens, however, did sue defendant over a dog bite. Defendant went to trial and was found "not guilty."

On cross-examination, Dennison acknowledged that the dog-bite case was a civil suit. He noted that in the years after the case, defendant held a grudge against the Giesenhagens. Dennison also stated that defendant never came to him complaining about someone; it was always other people complaining about defendant's behavior.

Angela Smith, a nurse at St. Francis Hospital who cared for defendant following the shootings, testified that defendant told her he "didn't know what the big deal was" and that he had done "nothing wrong." Defendant also told Smith that he had suffered for 30 years, but the victims had only suffered for 30 minutes.

Jerry Abbed testified that he has owned a grocery store in Toulon

for the past 15 years. About six months before the murders, he saw defendant threatening Tracey at the store. Abbed put his hand on defendant's shoulder and told him to "take it outside." Defendant responded by telling Abbed not to push him. After the incident, defendant's behavior toward Abbed completely changed. About a month later, defendant drove up to Abbed and yelled profanities at him. Defendant wanted to fight, so Abbed told him to get out of the truck and go to it. But defendant continued yelling and threatening until the police came five minutes later. This kind of behavior continued to the point where every time defendant saw Abbed he would swear at him and want to fight. About two weeks before the murders, defendant stopped his truck in front of the store and said to Abbed, "If you are man enough, follow me to the farm and I will kill you and nobody will find you there anyway."

Donald St. John testified that he was a farmer in Toulon and saw defendant on a periodic basis in connection with farming-related matters. On one occasion, the two men compared physical ailments, and defendant said that he suspected some of his neighbors of "stealing." St. John explained that defendant told him that one farmer would not sell defendant some heifers, but things were eventually patched up when the farmer sold them at a low price that pleased defendant. Furthermore, defendant never said that anyone was out to get him.

Under cross-examination, St. John admitted that all the incidents that defendant mentioned were real incidents and that they essentially amounted to a matter of people taking advantage of defendant in business transactions. For example, defendant was mad at a veterinarian that he had to pay for coming to help at the birth of a calf that died in the birthing process. St. John also acknowledged that defendant was capable of holding longstanding grudges.

Julian Hickman testified that he worked with defendant from 1969 until 1985. Although defendant was a hard worker, he was bitter and did not like authority. When Hickman became defendant's boss, defendant's attitude toward him "did not change much." One time, defendant brought Hickman's handicapped daughter a present while he was dressed as Santa Claus. On cross-examination, Hickman stated that defendant was fired nine different times from his job with the mining company, but he was able to get it back each time because

of union rules.

Art Whitaker testified that he was 64 years old and had known defendant since they were in grade school together. He worked with defendant for a year in the early 1960s. He lost track of defendant for a number of years after that, but reestablished a relationship when defendant started doing work for Whitaker's father-in-law. Whitaker noted one incident in which defendant was "shorted" on a deal involving cattle feed. Whitaker said that he knew defendant was right in this instance because the sellers admitted that they had shorted defendant.

On cross-examination, Whitaker stated that defendant held a grudge over being shorted on the cattle feed. Whitaker also recalled that one time he and defendant were visiting on the front porch of defendant's house when the phone rang. Defendant's wife answered and told defendant that James Giesenhagen was coming over to work on the furnace. Defendant then told Whitaker that he had to leave because Giesenhagen had a restraining order against defendant. Whitaker described defendant as a "normal" person.

The defense called clinical psychologist John Day, who testified that he conducted a psychological assessment of defendant, using two tests–the Minnesota Multiphasic Personality Inventory (MMPI) and the Millon Clinical Multiaxial Inventory (MCMI). The first addresses clinical issues, the second personality issues. The MMPI results indicated that defendant had "interpersonal alienation," which is difficulty relating to people "in the social realm." Day explained that a number of defendant's scores on this test exceeded the normal range and therefore became clinically significant. Defendant scored high in "paranoia, suspiciousness," and this was his highest score of all those that were elevated above the normal range. Day noted that he would expect to see a score like that in less than 2% of the population.

Day stated that defendant had elevated scores on the MCMI in "paranoid ideation," depression, and "avoidance of social situations." Day explained that defendant is not "psychotic by any means, but just has a different frame of reference than a typical person."

Day also testified that defendant discussed the murders with him during his evaluation. According to Day, defendant claimed that when the deputy came to serve the warrant, he entered through the door with a gun in hand and ordered defendant to put his shirt on.

Defendant told Day that he knew that as part of his probation, he had been ordered to pay $15 dollars a month for six to eight months, at which time the court would review his compliance in paying the fine. He also knew that he had not paid the required monthly payments and that the court had reviewed his noncompliance. When the officer came to his door, defendant had a shotgun sitting on a toolbox nearby. Defendant picked it up, and the deputy went back out the door. Defendant then went out the door with the shotgun. Defendant claimed that he shot the deputy because he believed the deputy was going to shoot him first, as he had pointed a gun at defendant's chest. After shooting the deputy, defendant went back inside and put his shirt on. When he came outside, he took the deputy's gun and squad car. He then went to the Giesenhagens' home because he "already had a deputy so why not get them." Defendant wanted Janet Giesenhagen to remember all the pain she had caused him when she sued him in the dog-bite case. Even though he had prevailed on the merits, it cost him $20,000 in legal bills, and the Giesenhagens had been "thumbing their nose at [him] for 15 years." Defendant claimed that he did not intend to kill them, he only "wanted to maim" them. After shooting the Giesenhagens, defendant drove through town and the police eventually caught up with him. He exchanged gun fire and ended up wounded in the head. Defendant concluded his rendition by telling Day that "I am supposed to be such a bad ass that people wanted to try to get me upset," but "I never swatted a fly unless it shit on me first."

Day believed that defendant was suffering from two disorders: delusional disorder of a persecutory type and paranoid personality disorder. "Delusional disorder of a persecutory type" is characterized by a false belief system grounded in nonbizarre delusions because it is based upon things that can happen in everyday life, as opposed to things that are not possible. The persecutory type of nonbizarre delusion applies when the theme of the delusion involves the personal belief that the person is "being conspired against, cheated, spied on, followed, poisoned or drugged, maliciously maligned, harassed, or obstructed in the pursuit of long-term goals, meaning their own personal goals." Day explained that even though there is no factual basis for thinking that any of those things are happening, the delusional person believes that they are. Day concluded that, on the day of the crimes, defendant suffered from a mental

disease–delusional disorder of a persecutory type–that prevented him from appreciating the criminality of his conduct.

On cross-examination, Day admitted that he never asked defendant such specific things as who was conspiring against him, who was harassing or maligning him, how they were doing it, or what his long-term goals were. Day explained that he did not ask defendant to elaborate on these matters because this would have ruined their rapport and would have made defendant suspicious. Day further emphasized that he did not ask about the specifics of defendant's beliefs because in making his diagnosis, he needed only to focus on the "themes of how [defendant] sees the world, not the yes or no facts." He was not concerned with determining if there was a rational basis for believing that there was a conspiracy against defendant; instead he was concerned only with "the behavioral patterns that would be interpreted back into his personality style."

Psychiatrist Robert Chapman also testified on behalf of defendant. Chapman conducted two diagnostic interviews of defendant and administered the MMPI to defendant. He determined from a review of defendant's history that defendant's mother was a self-centered and suspicious person, who had abandoned defendant at eight years old after his father had died. Defendant then lived with a relative for a number years. Defendant reported that he did not have any significant history of behavioral problems in school. He quit school after the tenth grade and married at the age of 17. He had three grown children, who were all college educated.

Chapman found a consistent thread running through his interviews: defendant claimed that he was the victim of harassment and abuse by "the powers that be," which included authority figures such as the police or anyone with power over him. In defendant's mind, there was a conspiracy against him, with the ultimate goal of driving him away or killing him. Chapman opined that defendant shot Streicher because defendant "was in fear of his life, that could be described as *** mortal fear, that the people, the conspiracy, the 20 years or more of harassment and attempt to do him in had converged into that moment and there was a situation in which he was in mortal danger. They were here, they were after me, they have come, they're over the wire, they've violated the perimeter, there [*sic*] in my house, this is it." Furthermore, according to Chapman, defendant considered

the Giesenhagens to be part of the "powers that be" because they had filed a lawsuit against him. It was as though the Giesenhagens "psychologically were standing right behind the officer."

Chapman concluded that defendant suffered from a "delusional disorder, persecutory type." Defendant's condition was chronic, continued after his crimes, and was not lessening. The diagnostic criteria for this disorder required that the person suffering from it experience a nonbizarre delusion for a period of at least one month. Defendant met this criterion because he has believed that there has been a conspiracy against him for over 20 years. Chapman explained the difference between a bizarre and nonbizarre delusion. A bizarre delusion, which defendant did not have, is something that cannot occur in real life, and would include schizophrenia and thought disorders, such as "disorganized thought, hallucinations, and deteriorating life course function." Defendant, in contrast, was able to raise and support a family, maintain some friends, lead a general law-abiding life and participate in the fabric of the community as much as his delusions would allow him. Chapman rejected the diagnosis of "antisocial personality disorder" because he felt that defendant did not meet the criteria, which required evidence of antisocial behavior in childhood, as well as criminal acts throughout his life that were designed to meet his own selfish ends. Chapman concluded that defendant lacked substantial capacity to appreciate the criminality of his conduct on the date of the offenses.

Under cross-examination, Dr. Chapman catalogued defendant's criminal history and said that it was consistent with his delusional belief system. In 1967, defendant punched a car dealer after bringing a car in for service. In 1971, he was convicted of disorderly conduct for fighting along a road next to the high school. In 1980, defendant fought with a neighbor, and in 1986, he was sued in two separate dog-bite cases–one brought by the Giesenhagens and one brought by Chad Boughan. In 1987, defendant hit his brother with a spade; defendant then went to the sheriff's department to tell them of the incident. In 1998, defendant wanted to fight Richard Hartley, a neighbor, because defendant had spread oil on the gravel of his property and he thought that Hartley had reported him over it.

According to Chapman, defendant said that on the day of the murders, he worked on his farm, returned home, ate dinner and began

watching television. Defendant told Chapman that he did not "expect" the officer. Defendant never said that he was afraid that he was going to be shot or that there had been a "breach of the perimeter." Chapman never asked defendant why he shot Officer Streicher. Conclusions about these things were inferred by Chapman on his own. Chapman acknowledged that when defendant referred to the "powers that be," he identified only the police, the sheriff and the State's Attorney. Chapman did not record anywhere in his written report that defendant had told him that the Giesenhagens were part of the "powers that be." Chapman acknowledged that defendant had told him that he had been suspended from school "one or more times" and had been in fights as a youth. When asked about the fights, defendant said that he had been picked on.

Chapman admitted that after his first interview with defendant, he had no firm diagnosis, but had written down "paranoid personality" and not "delusional disorder." He explained that after he discussed the case with defense lawyers and Dr. Day and reviewed Day's findings, he went back to examine defendant again to look for "missing information." He further explained that he was not convinced at that point that defendant had an "organized delusional system in place" so as to rule out the diagnosis of delusional disorder. At the second examination, defendant was more cooperative. Chapman admitted that defendant did not specify any incidents close in time to March 22, 2002, when defendant felt that he had been followed, maligned or harassed. The only incident Chapman recorded involved a time when a police officer stopped along the road to "harass" defendant's children and that occurred well over 20 years before. Chapman did not ask defendant about any of the facts surrounding the murders themselves during the second interview or why he shot Deputy Streicher and the Giesenhagens.

Chapman was asked "why [defendant] went over to the Giesenhagens and broke into their home if he was in mortal fear of his life?" Chapman responded that defendant "was in mortal fear when the officer was there," but then added that defendant did not tell him that, he merely assumed it from the clinical evidence. Chapman further stated that he was unsure as to whether defendant was actually in fear of the Giesenhagens. Chapman admitted that he did not ask defendant why he went over to the Giesenhagen home and initiated his aggressive action.

Chapman acknowledged that there were at least two incidents where defendant either initiated contact with the "powers that be" to elicit their aid or accepted their aid when it was offered. In 1989, the sheriff brought defendant's aging mother to defendant's home because it was determined that she could no longer live on her own. The next day, defendant called the sheriff to come to his house to "be a witness for him," while his mother recited where she wanted to live. Additionally, between 1986 and 1997, defendant was cordial with Shane Milroy, the Director of public works for Toulon. Defendant had some land use violations on his property, and defendant accepted Milroy's offer to have a city truck move some items on his land. Chapman also acknowledged that Milroy was someone who had power over defendant and could be considered part of the "powers that be." Chapman also admitted that documents showed that Milroy had testified on behalf of the Giesenhagens in the dog-bite case. Chapman opined, however, that defendant could get along with Milroy because Milroy never confronted defendant with an authoritative attitude.

Finally, Chapman testified that defendant did not meet the criteria for antisocial personality disorder. He acknowledged that the criteria for that disorder required a pervasive pattern of disregarding the rights of others, occurring from the age of 15, as indicated by three or more of the following: (1) failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest; (2) deceitfulness as indicated by repeated lying, using aliases or conning others for personal profit or pleasure; (3) impulsivity or failure to plan ahead; (4) irritability and aggressiveness as indicated by repeated physical fights or assaults; (5) reckless disregard for the safety of self or others; (6) consistent irresponsibility as indicated by repeated failure to sustain work behavior or honor financial obligations; (7) lack of remorse as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another. Chapman, however, did not believe that defendant met any of these seven criteria.

The State called psychiatrist Andrew Kowalkowski, who was appointed by the court to examine defendant as to his sanity at the time of the murders. Dr. Kowalkowski reviewed the background and historical information on defendant, the police reports and the psychological report of Dr. Day. Kowalkowski then conducted an

interview of defendant, where defendant discussed his personal and social history. Defendant also related his past criminal history and contact with law enforcement. Defendant recalled an incident that occurred when he was in his early twenties and his children were playing in the front yard. The sheriff pulled his vehicle in front of defendant's house and asked why the children were playing in the yard. Defendant felt that the sheriff was being "a smart ass." Defendant further remembered that he was once charged with aggravated battery and spent a week in jail. He was also fined for another incident, which he did not specify. Defendant also recalled a time when someone did not like the way he had parked his car, so defendant confronted him with a pick handle. Defendant described an ongoing problem he had over a large woodpile that he kept on his property to heat his home with. It had recently been started on fire by someone, and it was the second time it had happened. He believed that the first time it had been set on fire by Joseph Tracey, an employee of the Giesenhagens. Defendant was convicted of assault and placed on probation as a result of confronting Tracey over the woodpile situation. Defendant told Kowalkowski that when he "pissed the wrong way in their mind you came to court." Defendant said that 10 or 15 years earlier he had gone to court over an allegation that one of his dogs had bitten one of the Giesenhagens' children.

Defendant recounted to Kowalkowski that he had problems with other neighbors as well. James Rice and his roommate lived in a rented house next door. According to defendant, they had disturbed him by spinning donuts in the road and shooting out street lights.

Dr. Kowalkowski asked defendant about the events that occurred on March 22, 2002. Defendant said that he did not remember anything that happened on the night in question from the time he sat down to watch television around 6 p.m. until he was in the hospital for a gunshot wound inflicted by police. Defendant also said that he understood the charges that had been brought against him, and when asked why he was in jail, defendant responded, "you tell me, I suppose it is the powers to be." When Kowalkowski asked defendant to define what he meant by the phrase "the powers to be," defendant responded that his "own words were nowhere in the 800 pages of documents he's been allowed to review." This was the only time that defendant used the phrase "the powers to be" during the interview. Defendant also acknowledged that he understood that he was on

˘16˘

probation at the time the murders were committed. When asked if he knew it was wrong to kill someone, defendant responded, "I never killed a fly that did not shit on me first."

Dr. Kowalkowski believed that defendant was exhibiting "malingering amnesia" in claiming not to recall the events that occurred on the night of the murders. Malingering amnesia is the intentional production of false or grossly exaggerated physical or psychological symptoms to avoid prosecution. Kowalkowski noted that defendant's long- and short-term memory was intact, pointing out that defendant had told a hospital nurse that "he had shot that bitch in the hand so she would have a reminder for the next 20 or 30 years \*\*\*. She must have bled to death, didn't know how to make a tourniquet."

From his interview of defendant and review of the background information, Dr. Kowalkowski found no evidence of delusions, fixed false beliefs, or misinterpretation of external reality. Accordingly, Kowalkowski did not believe that defendant had any delusional disorder. Kowalkowski diagnosed defendant as having "paranoid personality disorder" and "antisocial personality disorder." A personality disorder is demonstrated by a pattern of inner beliefs and behavior that cause an individual to markedly deviate from the expectations of society. According to Dr. Kowalkowski, these disorders are not significant *mental* disorders or defects; rather, they are *behavior* or *conduct* disorders.

Kowalkowski explained that paranoid personality disorder requires that a person have a pervasive distrust and suspiciousness of others, interpreting their motives as malevolent, beginning by early adulthood and present in a variety of contexts, as indicated by at least four out of seven listed factors. Defendant satisfied four of the listed factors. First, he suspects, without sufficient basis, that others are exploiting, harming or deceiving him. Second, he is reluctant to confide in others because of unwarranted fear that the information will be maliciously used against him. Third, he persistently bears grudges and is unforgiving of insults, injuries and slights. Fourth, he perceives attacks on his character or reputation that are not apparent to others and is quick to react angrily or to counterattack.

With respect to the antisocial personality disorder, Kowalkowski noted the seven criteria used to diagnose it, and that these criteria

start in late adolescence and continue onward throughout life. Kowalkowski believed that this personality disorder manifested itself in defendant's repeated acts that are grounds for arrests, his impulsiveness, his irritability and aggressiveness, his repeated failure to maintain consistent work behavior and his lack of remorse. Thus, defendant satisfied five of the seven criteria, with only three needed to make the diagnosis. Kowalkowski further explained that there was some evidence of this conduct disorder before the age of 15 because defendant had reported that "at times he got into the average number of fights that kids would get into." When the doctor asked defendant to explain what he meant, defendant would not do so.

Dr. Kowalkowski concluded that defendant was not insane at the time he committed the murders. Defendant did not suffer from a mental disease or defect that would have caused him to lack substantial capacity to appreciate the criminality of his conduct. Paranoid personality disorder and antisocial personality disorder are major disorders of *behavior*, not mental disorders. Dr. Kowalkowski disagreed with the assessments of Drs. Day and Chapman, both of whom concluded that defendant suffered from a "delusional disorder, persecutory type." According to Dr. Kowalkowski, the threshold requirement for that kind of delusional disorder is nonbizarre delusions. Defendant did not suffer from any nonbizarre delusions, which entail a false belief. Defendant himself sought out law enforcement when he need help–he called the sheriff for assistance over the matter of his mother's guardianship and he asked for aid from Shane Milroy and was able to work cooperatively with him even though he was the director of public works for Toulon. Kowalkowski learned in an interview with defendant's son that defendant had mounted a legal defense to the dog-bite case because of the "principle of the matter" and no mention was made of a conspiracy, persecution or a false belief. Kowalkowski noted that in contrast to relating delusions, defendant consistently related information about *real* events that had occurred in the past. These were not delusions. Instead, defendant had a personality disorder–an enduring pattern of inner beliefs and behavior that caused him to be suspicious of others and to interpret their motives as malevolent.

On cross-examination, Dr. Kowalkowski testified that he premised his finding that defendant had a conduct disorder based on defendant's report of getting into fights as a child. Kowalkowski

acknowledged that defendant had not told him that he had started the fights. Kowalkowski had assumed that defendant initiated them because he refused to discuss them further when asked to do so. When asked about his finding that defendant did not have delusions, Kowalkowski testified that if defendant thought people were following him when they were not, this would qualify as paranoia, not a delusion. When asked if defendant's belief that the Giesenhagens had set his woodpile on fire was false, Kowalkowski replied that he did not know whether the Giesenhagens had set the woodpile on fire or not and, therefore, did not know if defendant's thinking about it was false. Finally, Kowalkowski stated that defendant likely refused to discuss the crimes because of his paranoid personality disorder.

In rebuttal, defendant recalled Dr. Chapman, who testified that defendant does not meet the diagnostic criteria for antisocial personality disorder because there is not enough information about defendant's childhood history to make a retrospective diagnosis of the disorder. Chapman explained that a reconstruction of defendant's childhood cannot be done in this case because both of his parents are now deceased and therefore cannot be interviewed, school records are not available, and the only evidence from people who knew him as a youth indicates that he was reliable, went to school and was a hard worker. Although defendant told Kowalkowski that he got into the "usual boyhood fights," it is not known who initiated the fights. Chapman opined that defendant likely refused to discuss the particulars of his crimes with Dr. Kowalkowski because of his delusional disorder.

Under cross-examination, Dr. Chapman admitted that he never attempted to delve into how many times defendant had gotten into fights or whether he had initiated them. Chapman also admitted that defendant had marked "true" to questions about having been suspended from school and having been sent to the principal's office for behavioral problems.

Following closing arguments, the jury was instructed on the applicable law. It subsequently rejected the insanity defense and the guilty but mentally ill verdict. Instead, it returned verdicts finding defendant guilty of three counts of first degree murder, two counts of attempted first degree murder, one count of disarming a peace officer,

one count of home invasion, one count of criminal damage to property and multiple counts of aggravated discharge of a firearm. The jury acquitted defendant of the armed robbery of Deputy Streicher, the attempted murder of Officer Rewerts and a count of aggravated vehicular hijacking.

After admonishments from the court, defendant waived a jury for both the eligibility and penalty phases of the sentencing hearing. The defense presented no evidence at the eligibility phase, and the trial court took judicial notice of the evidence introduced at trial and the convictions that were entered. The trial court found defendant eligible for the death penalty because defendant was at least 18 years old and had murdered a police officer during the course of his official duties, had murdered two or more persons, and had committed two of the murders during the course of a home invasion. The matter then proceeded to the penalty phase of sentencing.

In aggravation, the State first called Larry Bantz, who testified that he runs a drive-up produce stand located in the front of his house on Highway 78. On October 21, 2001, defendant drove up to the stand in a truck, loaded around 500 pounds of potatoes and 100 pounds of onions, and then drove away without paying anything for the produce. Bantz later learned that defendant was trying to sell the produce himself. About two weeks later, defendant returned to Bantz's produce stand and admitted that he had "wiped [Bantz] out of potatoes and onions a couple of weeks ago." Defendant then gave Bantz $50. When Bantz explained that the value of the produce was more than $50, defendant told him that he was not going to pay any more. Bantz's father, who was also present, told defendant that "it wasn't right." Defendant then told Bantz's father "to shut his fucking mouth or he would shut it for him" and that he would do what he wanted, when he wanted. When Bantz informed defendant that he was going to call the police, defendant responded that it did not make any difference, they had never done anything to him in the past. Bantz then told defendant that he did not want defendant coming back to the stand anymore unless he was going to pay for the produce. Defendant replied "fuck you," and told Bantz that he better watch his family, which included two children and a pregnant wife. A couple of days after this confrontation, defendant came by and in anger yelled at Bantz that he had better watch his family and his belongings. Sometime later, defendant again drove by Bantz's home,

"glaring" and "looking *** like he was checking things out."

On cross-examination, Bantz testified that he had reported his confrontation with defendant to the sheriff's department. Bantz acknowledged that he told defendant during their encounter that he owed a total of $64, and that at another point, he told defendant that if he ever came back he would leave either in "an ambulance or a body bag."

Judy Preston, a dispatcher at the Stark County jail, testified that in June 2003, she was supervising the facility when defendant was being held there. In accordance with jail procedures, Preston's job duties included opening all inmate mail and scanning it for contraband or inappropriate remarks. Preston informed defendant of this procedure. A short time later, Preston opened a letter from defendant to his wife, with words directed to Preston that stated, "look inside, bitch" and "you still have your fat nose in here." In another writing, defendant again referred to Preston as a "bitch" and stated "you still have your fucking nose in here and your fat ass, too." When informed that his conduct was inappropriate and could result in some of his mail privileges being revoked, defendant told Preston to "stick it up [her] ass."

Robert Winn, a chief deputy with the Stark County sheriff's department, testified that his duties included supervising visitation at the jail. In June 2005, Winn supervised a visit between defendant and his wife. During the visit, defendant told his wife that the employees at the jail were all "bastards" and he "should have shot them all." Defendant then asked about his dog, as defendant had been allowed to see the dog on a prior visit. When defendant was informed that no animals were allowed in the jail, defendant looked at Winn and said "fuck you." Thereafter, defendant repeatedly refused to flush the toilet in his jail cell, forcing plumbing modifications to be made to the jail flushing system.

After presenting victim impact testimony, the State rested, and the defense began its case in mitigation. Defendant introduced the psychological reports compiled by Day and Chapman. The first witness called by the defense was Dale King, an Illinois State Police investigator. King testified that he interviewed Bantz on May 9, 2002, about the theft that occurred at his produce stand. According to King, Bantz said that he had told defendant that if he ever came back

˘21˘

he would leave in either "an ambulance or a body bag." Defendant left, and Bantz never heard from defendant again and did not receive the remaining $50 that was owed.

The next witness called by the defense was 21-year-old Chaderick Carlton, who testified that he sometimes helped defendant do his chores. Carlton described defendant as smart, helpful and a good friend, who taught him a lot of things, such as how to make repairs. On cross-examination, Carlton acknowledged that defendant was handy enough to know how to saw off a 12-gauge shotgun to make it more deadly.

Mary Hartley testified that she was a neighbor of the defendant and that she got along fine with him. She attributed this to the fact that she stayed on "her side of the road" and did not let defendant's messy property bother her. Sometimes defendant glared at her, but other times they were able to talk about defendant's dog-training activities. Defendant was a hard worker, and when her house was damaged by fire, defendant was the first person to help her, bringing her a meal and letting her use a cell phone and a watch. On another occasion, defendant bought her a dish at an auction.

Walter Bass testified that he worked with defendant from 1988 to 1990 and the two became friends. Bass noted that defendant was amazingly handy. Defendant helped him on a number of occasions with personal projects and declined to be paid in return. Bass believed that defendant was honest because on one occasion defendant came to his house looking for a way to haul a pony he had promised to give some child for his birthday. On cross-examination, Bass testified that defendant had never complained to him that he had been harassed, conspired against or spied upon.

Michael Keller testified that he has known defendant for about seven or eight years. They met for coffee on a regular basis, and defendant helped him with repairs on Keller's property. Under cross-examination, Keller admitted that defendant held lengthy grudges and that a person had to "walk on egg shells, at times," around defendant. Defendant once became angry at Keller because Keller referred to a piece of machinery owned by defendant as "old." Keller was aware that defendant had killed two persons over a grudge, but he still considered defendant to be a friend.

Eugene Boehle, a building contractor, testified that he hired

defendant to pour concrete and do odd jobs. Defendant was a good, dependable worker. Boehle felt that defendant was trustworthy and noted that on one occasion, in a snowstorm, defendant returned a tractor he had borrowed because he thought Boehle might need it. Boehle also noted that a week before the murders he had breakfast with defendant.

Gregory Knowles testified that he considered defendant a friend, but not a close friend. Defendant helped Knowles with a number of projects and did not ask for payment. On cross-examination, Knowles noted that defendant was easily angered if anyone tried to argue with him.

Barbara Kraklow and Janine Streitmatter testified that defendant helped them with projects. Streitmatter said that defendant was good to her and described him as the "nicest guy you would ever want to meet."

David Thompson, defendant's son, was also called to testify. David stated that he was 40 years old at the time of trial and that he had an older brother and sister. He graduated from Bradley University in 1985, and was currently employed by the Illinois Department of Transportation as an engineer. Defendant paid for the college education of each of defendant's children. David described his upbringing as normal and said that defendant was a good father, who taught him to work hard. David also stated that defendant spoiled David's daughter Corey with nice gifts. On one occasion, Corey asked defendant for a pony, and he brought her one on a truck and delivered it to the backyard.

David testified that 13 years ago he bought defendant a 13-acre farm because defendant always wanted to be a farmer and he loved animals. After defendant was fired from his job with the mining company in the mid-1980s, it was harder for him to make ends meet, and he became frustrated when the work he did for others was not fairly compensated.

Under cross-examination, David testified that defendant carried a weapon on a routine basis, but he never left a weapon lying around the house, where somebody could grab it and hurt someone accidentally. Defendant kept three loaded guns in his truck and 10 or 12 guns in his house.

Amy Lewis was the final witness called by defendant. Lewis

testified that her family owns a farm that is one-half mile from defendant's property. She described defendant as a good friend. They helped each other with making improvements to their respective properties. Defendant also worked for her husband in her husband's building-contractor business, as defendant was a fine carpenter. Lewis also noted that she and her family went on a number of camping and fishing trips with defendant, and they always had a good time with him. Lewis stated that she has regularly visited and written to defendant while he has been in jail and values defendant's friendship. On cross-examination, Lewis testified that there was never anything bizarre about defendant's actions and he always socialized in a normal manner.

After hearing closing arguments, the trial court recessed to consider its verdict. When it returned, the court recounted the evidence presented in aggravation and mitigation and then concluded that there were no mitigating factors sufficient to preclude imposition of the death penalty. Accordingly, the court sentenced defendant to death.

## ANALYSIS

At the outset, we note that the parties advocate differing standards of review for assessing a claim that a death sentence is an excessive punishment in light of the aggravation and mitigation presented at the sentencing proceeding. The State urges that we review the death penalty determination for an abuse of discretion, and defendant contends that we conduct a careful review of the record that is just short of a *de novo* review. Consequently, we will briefly discuss the appropriate standard of review to be employed in this area of our jurisprudence.

A perusal of our case law shows that we apply neither a pure abuse of discretion nor a pure *de novo* standard in deciding the propriety of a death sentence. Some older decisions of this court appear to have reviewed capital, excessive-sentencing challenges for an abuse of discretion. See, *e.g.*, *People v. Ward*, 154 Ill. 2d 272, 338 (1992); *People v. Foster*, 119 Ill. 2d 69, 103-04 (1987).[1] More

---

[1]Review of a death penalty sentence for an abuse of discretion is all that is constitutionally required. The United States Supreme Court has noted that

recently, however, we have noted that although the abuse of discretion standard pertains to sentencing determinations in general, we are less deferential to the trial court in cases involving a sentence of death (*People v. Williams*, 192 Ill. 2d 548, 576 (2000)). Yet, despite the diminished deference when a sentence of death is imposed, a capital sentencer's decision will not be lightly overturned where it is amply supported by the record. See *People v. Mertz*, 218 Ill. 2d 1, 54 (2005), citing *People v. Taylor*, 166 Ill. 2d 414, 432 (1995); see also *People v. Burton*, 184 Ill. 2d 1, 35-36 (1998).

Given the qualitative difference between death and imprisonment as penalties, we reject the notion that a pure abuse of discretion standard of review should obtain in capital cases. Instead, we believe that it is appropriate to give some deference to the trial court or jury on matters involving factual and credibility determinations (see *People v. Ballard*, 206 Ill. 2d 151, 188-89 (2002)), while at the same time subjecting the record to intense scrutiny to ensure that only those deserving of the ultimate penalty are so sentenced. In doing so, we are guided by the following well-settled principles and standards.

The decision made at the second stage of a death penalty hearing is, and always has been, a process of evidentiary balancing. *Mertz*, 218 Ill. 2d at 54. It requires the trier of fact to measure the evidence in aggravation against the evidence in mitigation. See *Mertz*, 218 Ill. 2d at 54; *Ballard*, 206 Ill. 2d at 188; *Taylor*, 166 Ill. 2d at 432. After a defendant is found death eligible, the trier of fact is then free to consider a myriad of factors to determine whether death is the appropriate punishment. *Simmons v. South Carolina*, 512 U.S. 154,

---

the Constitution requires "meaningful appellate review, and that this standard is satisfied in a "weighing" state, such as Illinois, by an appellate court's considering "whether the evidence is such that the sentencer could have arrived at the death sentence that was imposed." *Clemons v. Mississippi*, 494 U.S. 738, 748-49, 108 L. Ed. 2d 725, 738, 110 S. Ct. 1441, 1448 (1990).

163, 129 L. Ed. 2d 133, 142, 114 S. Ct. 2187, 2193 (1994); *California v. Ramos*, 463 U.S. 992, 1008, 77 L. Ed. 2d 1171, 1185, 103 S. Ct. 3446, 3457 (1983). A defendant's character, prior criminal history, mental capacity, background, age, and future dangerousness are just a few of the factors that a trier of fact may consider in fixing the appropriate punishment. *Mertz*, 218 Ill. 2d at 56, citing *Simmons*, 512 U.S. at 163, 129 L. Ed. 2d at 142, 114 S. Ct. at 2193-94. Because it is a weighing process for the trier of fact, which has the superior opportunity to assess firsthand the credibility and believability of the witnesses on the stand, we will not lightly overturn the trier of fact's decision. See *Ballard*, 206 Ill. 2d at 188-89. While keeping this in mind, we will conduct our own thorough and careful review, considering the circumstances of the crimes and the character of the defendant to determine whether the death penalty is appropriate. *People v. Chapman*, 194 Ill. 2d 186, 253-54 (2000).

As we recently stated in both *Mertz* and *Ballard*,

" 'In determining whether a sentence of death is proper, we must consider 'the character and record of the individual offender and the circumstances of the particular offense.' *People v. Pitsonbarger*, 142 Ill. 2d 353, 388 (1990), citing *Woodson v. North Carolina*, 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991 (1976). '[E]ach capital case is unique and must be evaluated on its own facts, focusing on whether the circumstances of the crime and the character of the defendant are such that the deterrent and retributive functions of the ultimate sanction will be served by imposing the death penalty.' *People v. Johnson*, 128 Ill. 2d 253, 280 (1989). 'A death sentence is appropriate if the sentence is commensurate with the seriousness of the offenses and gives adequate consideration to relevant mitigating circumstances.' *Pitsonbarger*, 142 Ill. 2d at 388." *Mertz*, 218 Ill. 2d at 55, quoting *Ballard*, 206 Ill. 2d at 179.

When requested to do so, this court reviews the evidence in a capital sentencing hearing to determine whether death is the appropriate penalty, even in the absence of trial error. *Mertz*, 218 Ill. 2d at 54. This is consistent with the legislative directive that this court may overturn a death sentence–irrespective of any procedural grounds or trial error–if this court finds that the death sentence is

"fundamentally unjust as applied to the particular case." 720 ILCS 5/9‒1(i) (West 2004).

### I. Excessive-Sentence Argument

With these principles in mind, we turn now to defendant's contention that his death sentence is excessive. Defendant claims that the death penalty is inappropriate because he acted under an extreme mental disturbance at the time of the murders and he had no significant prior criminal history.

Section 9‒1(c) of the death penalty statute provides that the trier of fact shall consider any aggravating and mitigating factors which are relevant to the imposition of the death penalty. 720 ILCS 5/9‒1(c) (West 2004). Aggravating factors may include, but need not be limited to, those set forth in subsection (b), which include that the defendant murdered a peace officer engaged in his official duties, that the defendant murdered two or more persons and that the defendant murdered someone during the course of a home invasion. 720 ILCS 5/9‒1(b), (c) (West 2004). Listed among the statutory mitigating factors that the court may consider, along with others not listed, are that (1) the defendant has no significant history of prior criminal activity and (2) the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution. 720 ILCS 5/9‒1(c)(1), (c)(2) (West 2004). If the trier of fact determines beyond a reasonable doubt that one or more of the factors set forth in subsection (b) exists at the first stage of the sentencing proceeding, the trier of fact shall then consider any aggravating and mitigating factors as indicated in subsection (c) at the second stage, known as the penalty phase of the proceeding. 720 ILCS 5/9‒1(f), (h) (West 2004). If the trier of fact determines that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death. 720 ILCS 5/9‒1(h) (West 2004).

The mere existence of mitigating evidence does not preclude imposition of the death penalty. *Burton*, 184 Ill. 2d at 34. It is presumed that the circuit court considered any mitigating evidence before it, absent some indication to the contrary other than the sentence itself. *Burton*, 184 Ill. 2d at 34. Furthermore, a sentencer

may consider, in aggravation, evidence of a defendant's prior misconduct, even though the conduct may not have resulted in prosecution or conviction. *People v. Davis*, 205 Ill. 2d 349, 367 (2002). If the aggravation is believed, the trier of fact may find that a defendant's mitigation evidence was insufficient to overcome the aggravating factors. *Davis*, 205 Ill. 2d at 368-69.

The trial court in the present case considered all of the evidence and its plausibility, the testimony of the witnesses and their credibility, and the law that applies to the decision of whether or not the death penalty should be imposed. Additionally, the court considered the nature and circumstances of the offenses committed, the history, character and condition of defendant, as well as whether or not defendant could be restored to useful citizenship.

Specifically, the trial court cited in aggravation the serious crimes that were committed by defendant while armed with a sawed-off shotgun, a weapon that has no legitimate purpose. Additionally, the court noted that defendant had committed past crimes against others, both charged and uncharged, and that he was on criminal probation and in violation of it at the time the offenses were committed on March 22, 2002. The court further noted that defendant had sought to demonstrate that he acted out of a paranoid and delusional fear, or some other mental or psychological ailment. The court found, however, that defendant's acts were not the product of insanity or any kind of mental or psychological malady. Instead, the court found that defendant had acted out of hatred for those who served in the community as law enforcement officers and out of hatred and bitterness for neighbors who crossed his path. Moreover, defendant had continued to hurt, insult, threaten and intimidate others even while incarcerated, and therefore continued to pose a threat to society.

The trial court acknowledged the evidence offered in mitigation showing defendant's talents, good deeds, capacity for normal friendships, his childhood, and his concern for his family. The court found, however, that the mitigation was outweighed by the overwhelming evidence in aggravation–specifically, "evidence of defendant's criminal intent, violent revenge, hatred of people and authority, threats and intimidation of citizens of [the] community and the apparent belief that [defendant] with a sawed off shotgun in hand

has the right to determine that those who sue him or disagree with him or whose duty it is to arrest him shall die." Finally, the court looked for any evidence of remorse, no matter how remote, but was unable to find any. Instead, the court found that defendant's comments, character and attitude suggested that, if given the opportunity, defendant would kill again for "whatever unjustified purpose he determined."

After careful review, we conclude that the finding that defendant did not act under an extreme mental disturbance at the time of the murders is amply supported by the record. Dr. Kowalkowski testified that defendant did not suffer from any delusional disorder. Rather, defendant suffered from two *behavioral* disorders–paranoid personality disorder and antisocial personality disorder. These were not significant *mental* disorders. Kowalkowski explained that some of the key ingredients of a paranoid personality disorder included (1) suspecting others of harming, exploiting or deceiving without a sufficient basis to do so, (2) reluctance to confide in others because of unwarranted fear that the information will be maliciously used, (3) persistently bearing grudges and having an intolerance for insults, injuries and slights, and (4) perceiving attacks on one's character that are not apparent to others and being quick to react angrily or counterattack. These indicia were well supported by the testimonial evidence at trial that came from defendant's neighbors and acquaintances, which indicated that defendant held long-standing grudges, did not like to be argued with, and became upset if things did not go his way. Dr. Day, defendant's own expert, also believed that defendant had a paranoid personality disorder. Dr. Kowalkowski did not find any evidence of delusions, noting that defendant's reactions were all based on real events and his reactions were explained by his personality disorders.

In contrast to Dr. Kowalkowski, the two defense experts–Drs. Chapman and Day–did believe that defendant had a delusional disorder. Specifically, Chapman testified that defendant shot Deputy Streicher because defendant was in "mortal fear" for his own life based on a "20-year conspiracy," and that it was as though the Giesenhagens "psychologically were standing right behind the officer." However, Chapman testified on cross-examination that he merely assumed these things. Moreover, he was not sure that defendant was actually in fear of the Giesenhagens and he never

asked defendant why he initiated the aggressive action toward them.

We believe that the suggestion that defendant acted out of a delusional "mortal fear" is belied by the overwhelming evidence in the record to the contrary. Defendant never stated that he was afraid of the police or the Giesenhagens. Instead, defendant explained that he murdered the Giesenhagens because he had already killed a deputy "so why not get them." In other words, defendant was already looking at a life sentence, at a minimum, for killing a police officer, so he felt free to kill two of his neighbors against whom he held a grudge. Defendant himself explained that he killed the Giesenhagens because he wanted to punish them for having filed a lawsuit against him and they "had been thumbing their nose at [him] for 15 years." None of this, of course, indicates "mortal fear" even in defendant's mind. Rather, it shows that defendant was motivated by revenge and hate for neighbors that had crossed him. Defendant's disdain for the police likely stemmed from an incident that occurred many years before when a police officer stopped to ask about his children playing in the front yard and defendant thought the officer was "being a smart ass." We find nothing particularly significant about defendant's use of the phrase "the powers to be" to describe the police.

We further note that the evidence showed that defendant knew that Streicher had come to his door because defendant had not paid the small amount of court costs that were assessed on his assault conviction. Defendant's claim that Streicher pulled a weapon on him appears to be a self-serving attempt by defendant to lessen his culpability rather than a product of a delusion. In any event, the claim was contradicted by the eyewitness testimony of James Batey, who testified that the deputy stood outside defendant's door with his hands at his side just before the shooting.

Defendant's own actions and words also contradict any notion that he was afraid of police officers or authority. Instead, defendant's actions and comments indicate that he had a *disdain* for police and authority. On various occasions, defendant actually sought out police to harass them, tailgating and swerving at them in his vehicle. When Chief Deputy Dison came to defendant's house two months before the murders and cordially explained that defendant could post bond on the outstanding warrant against him by simply coming to the station within the next week, defendant replied, "you will have to

come back and get me." Thereafter, defendant did not pay the $100 bond, but instead armed himself with a sawed-off shotgun, which he kept within easy reach in his living room. After killing the Giesenhagens, defendant drove slowly through town, seeking out other police officers to harm.

Defendant's comments to Larry Bantz at the time of their confrontation at the produce stand also show that defendant had no fear of the police department. When Bantz informed defendant that he was going to call the police, defendant responded that it would not make any difference because "they had never done anything to him in the past."

The evidence further showed that defendant accepted and sought out the aid of police and those in authority when it suited him. Defendant called the Stark County sheriff for assistance with his mother's guardianship. Moreover, defendant asked for and accepted aid from Shane Milroy, working cooperatively with him, even though Milroy was a public official and had been a witness for the Giesenhagens in their dog-bite case. Finally, Lonny Dennison, the Stark County sheriff for 20 years, testified that he had "dealings with defendant that went real well," but if things did not go defendant's way, then he would be upset. Dr. Kowalkowski pointed to these incidents of cooperation with law enforcement as an indication that defendant did not have nonbizarre delusions as the defense experts claimed, but was instead tied into reality, always relating real events, albeit interpreting them through his paranoid and antisocial personality disorders. Under the circumstances, we see no reason to disturb the trial court's finding that defendant did not act under a significant mental or psychological impairment at the time of the offenses at issue.

We also note that even if defendant did have a significant psychological disorder, we would still find that the sentencing court in this case properly concluded that the mitigation evidence was not sufficient to preclude the imposition of the death penalty when weighed against the aggravating evidence. This court has repeatedly held that evidence of a defendant's mental or psychological impairments may not be inherently mitigating, or may not be mitigating enough to overcome the evidence in aggravation. *Ballard*, 206 Ill. 2d at 190 (death penalty affirmed despite evidence that the

defendant suffered from a bipolar disorder that is characterized by extremes of mood and sometimes "delusions and hallucinations"); *People v. Macri*, 185 Ill. 2d 1, 66 (1998) (prosecutor could properly argue in aggravation that the defendant's antisocial personality disorder showed his violent nature); *People v. Madej*, 177 Ill. 2d 116, 139 (1997) (the defendant sought to show at a postconviction proceeding that his substance abuse negatively affected his psychological and neurological health, but was ultimately unsuccessful on his petition because mitigation evidence of defendant's mental health does not necessarily preclude a death sentence); *People v. Tenner*, 175 Ill. 2d 372, 382 (1997) (defense counsel was not ineffective where he failed to obtain a mental health evaluation because such evidence is not inherently mitigating); see also *Taylor*, 166 Ill. 2d at 432 (death penalty was appropriate despite defendant's mental condition–schizo-typal personality disorder–which resulted in the defendant hearing voices); *People v. Christiansen*, 116 Ill. 2d 96, 129 (1987) (death penalty appropriate despite mitigating evidence of emotional and mental disturbance, alcoholism, drug addiction, poor health, deprived childhood, and remorse); *People v. Montgomery*, 112 Ill. 2d 517, 533 (1986) (death penalty appropriate despite an extreme mental or emotional disturbance). A judge or jury considering evidence of this nature at sentencing might view the information as either mitigating or aggravating, depending of course, on whether the individual hearing the evidence finds that it evokes compassion or demonstrates possible future dangerousness. *Ballard*, 206 Ill. 2d at 190; *Macri*, 185 Ill. 2d at 66. Furthermore, even if a defendant's psychological and neurological impairments are considered as mitigating factors, such evidence does not preclude imposition of a death sentence when that evidence is outweighed by aggravating evidence. *Ballard*, 206 Ill. 2d at 190; *Madej*, 177 Ill. 2d at 139-40; *Taylor*, 166 Ill. 2d at 432-33.

Here, the trial court specifically found that defendant remained a threat to society, and that if given the opportunity, he would continue to be violent. We believe that this conclusion was supported by defendant's shocking lack of remorse, his threats to others in the community and his statements that he regretted not being able to shoot jailhouse employees and that "more people were going to get it when he got out." With respect to his lack of remorse, defendant chided 10-year-old Ashley Giesenhagen for not closing her eyes

when defendant gunned down her parents in the child's presence. Even though defendant had shot Ashley's mother with a sawed-off shotgun at close range, causing massive injuries, defendant scolded the victim for not knowing how to fashion a tourniquet, adding "but the bitch died anyway." Defendant was also rude and insulting to jailhouse staff, and indicated that he would have liked to kill them too. Given that a defendant arrested for a capital crime has every incentive to behave flawlessly while incarcerated because good behavior might cause a sentencing authority to spare his life (*Mertz*, 218 Ill. 2d at 90; *Ballard*, 206 Ill. 2d at 189), it is truly remarkable that defendant continued to be abusive and belligerent. It indicates that the trial court justifiably concluded that defendant remained a serious danger to others, even in a prison setting, and that executing him was the only means of eliminating the threat to prison staff or other inmates. See *Mertz*, 218 Ill. 2d at 90, citing *Simmons*, 512 U.S. at 165 n.5, 129 L. Ed. 2d at 143 n.5, 114 S. Ct. at 2194 n.5.

Defendant contends that his prior criminal history was minor and should be considered a mitigating factor. We agree that this is an appropriate mitigating factor to consider. However, it is presumed that the trial court considered any mitigating evidence before it, absent some indication to the contrary other than the sentence itself. *Burton*, 184 Ill. 2d at 34. Furthermore, the sentencing authority in a capital case may consider, in aggravation, evidence of a defendant's prior misconduct, even though the conduct may not have resulted in prosecution or conviction. *Davis*, 205 Ill. 2d at 367, quoting *People v. Smith*, 176 Ill. 2d 217, 255 (1997). If the aggravation is believed, the trier of fact may find that a defendant's mitigation evidence was insufficient to overcome the aggravating factors. *Davis*, 205 Ill. 2d at 368-69, quoting *People v. Flores*, 153 Ill. 2d 264, 296 (1992). Here, the trial court considered defendant's prior misconduct, both charged and uncharged, and concluded that it, along with all of the other aggravating evidence, outweighed the mitigating evidence. This was proper under *Davis*, 205 Ill. 2d at 365-71.

Specifically, the court had before it evidence that aside from the violent crimes of March 22, 2002, defendant threatened Jason Rice with a club, threatened Joseph Tracey with a hammer, later verbally assaulted Tracey in the grocery store, blocked intersections around Toulon, tailgated police, threatened to kill Jerry Abbed and leave his body in place where "no one would find him," and stole produce from

Bantz's farm stand and then threatened Bantz's family. The court also heard testimony that defendant had a number of physically violent outbursts from 1967 through 1998, in which he attacked various neighbors, a car dealer and a sibling.

Defendant further argues that his positive life accomplishments–some good deeds, hard work, concern for his family, helping his children through school and normal friendships–should be considered as some evidence in mitigation to tip the scale in his favor. The trial court, however, carefully considered all of this evidence and concluded that it was outweighed by the aggravating circumstances mentioned above, which included the nature of the crimes committed on March 22, 2002, taken together with defendant's long-standing history of threats and intimidation against citizens of the community and his unrepentant belief that he has a right to shoot people with a sawed-off shotgun who disagree with him or sue him. Under the circumstances, we find that the trial court's conclusion that the mitigating evidence was insufficient to preclude imposition of the death penalty in light of the aggravating evidence was amply supported by the record.

Defendant cites *People v. Carlson*, 79 Ill. 2d 564 (1980), *People v. Buggs*, 112 Ill. 2d 284 (1986), *People v. Johnson*, 128 Ill. 2d 253 (1989), and *People v. Leger*, 149 Ill. 2d 355 (1992), cases in which the death penalty was vacated as excessive, and argues that there is no basis on which those cases may be distinguished from the present one. Defendant quotes *People v. Thomas*, 178 Ill. 2d 215, 249-50 (1997), as distilling from the foregoing line of cases the factors this court considers most significant in considering whether a death sentence is excessive: "the circumstances surrounding the murder generally involved the defendant acting under an extreme mental or emotional disturbance. [Citations.] In addition, the defendants in those cases generally led blameless lives with little contact with the criminal justice system."

The State argues that the cases cited by defendant are distinguishable. First, in all four cases the murders were accompanied by sudden, explosive outbursts. Here, defendant's conduct was an amplification of a violent, mean and confrontational attitude for which defendant was well known in the community. Second, *Buggs* and *Carlson* rested on the crucial fact that there were two statutory mitigating factors in play for defendants: they acted under extreme

mental or emotional disturbances and they had no significant prior criminal history. Here, defendant had a behavioral disorder, not a mental disorder, and had not led a blameless life. Third, in *Buggs* and *Carlson*, defendants found themselves at the center of "unique and tragic" events which were not likely to be repeated in the future: each defendant was experiencing unique and complicated marital problems. In contrast, defendant here was not confronted with "tragic" events; rather, defendant was confronted with routine, even mundane events in that he was served with a warrant that he could have satisfied by paying $100 and he had been a defendant in a dog-bite case 15 years earlier. Fourth, each case is distinguishable from the present case on any one of a number of salient points–like military service, a show of remorse, a relatively blameless life, or severe marital difficulties.

Defendant urges a comparison of this case with the facts of *Carlson, Buggs, Johnson* and *Leger*, but we note that comparative proportionality review in death penalty cases is not required by the United States Constitution,[2] and it is not a feature of the capital sentencing process under the Illinois Constitution (*Williams*, 192 Ill. 2d at 576; *People v. Cole*, 172 Ill. 2d 85, 115 (1996); *People v. Palmer*, 162 Ill. 2d 465, 491 (1994)). Nonetheless, on a number of occasions this court has indicated that the principles enunciated in these cases may be helpful in determining whether the death penalty is appropriate, while emphasizing that each case must ultimately be evaluated on its own facts. See, *e.g.*, *People v. Heard*, 187 Ill. 2d 36,

---

[2]In *Pulley v. Harris*, 465 U.S. 37, 44, 79 L. Ed. 2d 29, 36, 104 S. Ct. 871, 875-76 (1984), the United States Supreme Court determined that the eighth and fourteenth amendments do not mandate proportionality review by a state supreme court to prevent the death penalty from being "wantonly and freakishly" imposed. The Court found that it is enough if the statutory scheme limits jury discretion by requiring the jury to find at least one of a list of aggravating circumstances beyond a reasonable doubt before imposing the penalty, and thoughtful and effective appellate review is conducted, focusing on the circumstances present in the particular case. *Pulley*, 465 U.S. at 53, 79 L. Ed. 2d at 42, 104 S. Ct. at 881. Moreover, as previously noted, the appellate review requirement is satisfied by a reviewing court's consideration of "whether the evidence is such that the sentencer could have arrived at the death sentenced that was imposed." *Clemons*, 494 U.S. at 748-49, 108 L. Ed. 2d at 738, 110 S. Ct. at 1448.

85-86 (1999); *Palmer*, 162 Ill. 2d at 491; *Johnson*, 128 Ill. 2d at 280. Under the circumstances presented here, we do not believe that the *Carlson* line of cases requires that the trier of fact's decision be overturned and defendant's death sentence be vacated.

In *Carlson*, the defendant had led a crime-free life up to the date that he shot and killed his ex-wife, which was three months after they divorced. They had planned to remarry, but the ex-wife told the defendant that she had a new boyfriend. When police tried to arrest the defendant at a bar several hours after the shooting, the defendant shot and killed an officer. The defendant later claimed that he had been attempting suicide when the officer was shot. The defendant had been suffering from severe mental and emotional problems before the shootings. He had also had two heart attacks and was undergoing a slow grieving process related to the loss of affection of his wife. Shortly after he shot his wife, the defendant sought to make provisions for his son. This court found that these circumstances "do not bespeak a man with a malignant heart who must be permanently eliminated from society." *Carlson*, 79 Ill. 2d at 590.

In *Buggs*, the defendant and his wife had been arguing about her infidelity, when the wife told the defendant that he was not the father of their two sons. At that point, the defendant poured gasoline on his wife and lit the house on fire. The defendant's wife and son were killed in the blaze. The court noted that the defendant had no prior criminal history (though there was evidence presented that the defendant had previously stabbed someone and had fired a shot between his son's legs during an argument with his wife), he had served his country honorably in the military for 21 years, and it was the marital disharmony that had triggered the tragic sequence of events. This court vacated the defendant's death sentence under the authority of *Carlson*. *Buggs*, 112 Ill. 2d at 293-95.

In *Johnson*, the defendant was unjustly fired from a job and returned to his former place of employment for a final paycheck only to be told that there was no paycheck for him. The defendant shot and killed one former coworker and wounded two others. On the day of the offenses, the defendant had used alcohol, cocaine, and marijuana laced with PCP. This court found that the deterrent purposes of the death penalty would not be served by putting the defendant to death because he had led a relatively blameless life before the murder, he was not known to be violent or untruthful, the crime was an

aberration not likely to be repeated, he had only one misdemeanor conviction for which he successfully completed supervision, he had expressed remorse to the victims and their families, and had acted under a "good deal of stress, which in his mind may have been equal to that suffered by the defendants in *Buggs* and *Carlson*." *Johnson*, 128 Ill. 2d at 278-81.

In *Leger*, the defendant shot and killed his estranged wife five days before their divorce became final. Later that same night, the defendant shot his former wife and her new husband. The defendant had suffered from a chronic and painful injury. On the date of the offenses, the defendant was taking 10 different medications, had a drinking problem and had a history of blackouts. Moreover, the defendant had expressed remorse for his crimes, his prior convictions were related to his marriage problems, he got along well with people in the community and did not display any violence toward them, and had honorably served in the armed forces for 3½ years. Based on all the circumstances and the fact that the violent acts were triggered by the defendant's emotional disturbance over his marital problems, the court reduced the sentence to natural life. *Leger*, 149 Ill. 2d at 412-14.

The foregoing cases can be easily distinguished from the present one. The criminal conduct of the defendants in those cases was triggered by provocative events related to stressful marital or employment situations that led to sudden, explosive outbursts. In the present case, defendant erupted over a routine event only because he was filled with hate and disdain for authority and because he held a grudge against his neighbors who had sued him some 15 years earlier. Moreover, although the present murders were uniquely extreme in terms of defendant's past conduct, defendant had a history of violent and threatening behavior towards others in the community, unlike the defendants in the above-mentioned cases. The instant crimes are also distinguishable from the ones mentioned above in terms of severity. Defendant killed *three* persons, who were wholly unrelated to him and who had not provoked him in any way near the date of the offenses. He was also convicted of the attempted murder of two more persons. The Giesenhagens' only dealings with the defendant appear to be limited to a dog-bite incident that occurred some 15 years earlier. Additionally, the fact that defendant kept a sawed-off shotgun within easy reach in his living room after telling police they would have to "come back and get [him]" indicates some

level of forethought.

But perhaps of greatest significance in distinguishing the *Carlson* line of cases is the shocking lack of remorse and rehabilitative potential of defendant. As previously mentioned, defendant was only sorry that he had not killed more peace officers. There is also no indication that he has ever relented from his belief that he has a right to shoot people at close range with a sawed-off shotgun if they "shit on [him] first." In contrast to *Carlson* and its progeny, where the murders were the result of tragic, one-time events that were not likely to be repeated because of the remorse of the offenders and their general character, defendant had a long history of threats and violence against others in the community. The trial court specifically found that if given an opportunity, defendant "would continue right where he left off." Additionally, defendant cannot be ruled out as a future threat to society even while incarcerated. Defendant's lack of remorse and future dangerousness clearly sets him apart from the offenders in *Carlson* and subsequent cases that have followed its lead.

Instead, we find that the facts of the present case are closer to those in *People v. Heard*, 187 Ill. 2d 36 (1999), and *People v. Cole*, 172 Ill. 2d 85 (1996), where death sentences were affirmed over excessive-sentencing challenges. In *Heard*, the defendant shot three persons to death–his ex-girlfriend, her boyfriend and another person at the scene. The murders were the result of an obsession the defendant had with his ex-girlfriend that resulted in a pattern of harassment and stalking. The defendant maintained that he had been operating under an emotional disturbance at the time of the murders, and he presented extensive evidence in mitigation showing that he was a hardworking, caring and nonviolent person, who had helped others during financial and emotional crises. The defendant also had no significant criminal history. *Heard* distinguished the *Carlson* line of cases by noting that the murders in the case before it were the "culmination of an escalating history of violence by defendant against the victims, not a spontaneous reaction to information such as the infidelity of a spouse." *Heard*, 187 Ill. 2d at 88. *Heard* found unpersuasive the defendant's claim that murdering someone because of an obsession should be considered mitigating. *Heard*, 187 Ill. 2d at 88-89.

In *Cole*, the defendant killed the mother and brother of his ex-girlfriend with a shotgun. The shootings were triggered by the defendant's obsession with his ex-girlfriend after she moved out of their shared residence and obtained an order of protection against the defendant. This court concluded that the defendant's conduct was more akin to stalking than to the sudden, explosive outbursts found in *Carlson*, *Buggs*, *Johnson*, and *Leger*. *Cole*, 172 Ill. 2d at 111.

Similarly, we find that defendant's conduct was the culmination of an escalating pattern of violence against citizens in the community of Toulon, and not the result of a spontaneous reaction to information such as the infidelity of a spouse. The trial court's assessment that defendant did not suffer from a psychological malady was also well supported by the record, as was the determination that defendant posed a continuing threat to society. Additionally, even if defendant had established the mitigating circumstance that he acted under an extreme mental disturbance, we would not view it as sufficient to overcome the aggravating circumstances in this case. Accordingly, we reject the contention that the cases cited by defendant require that his death sentence be vacated. After careful review of the circumstances of the crimes in this case and the character of defendant, we conclude that the death penalty is the appropriate penalty in this case and that its imposition was not fundamentally unjust.

## II. Constitutional Issues

Citing *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and *Ring v. Arizona*, 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002), defendant next argues that the Illinois death penalty statute is unconstitutional because the State is not required to prove beyond a reasonable doubt that there are no mitigating factors sufficient to preclude the death sentence. We recently rejected the same argument in *Mertz* and *Ballard*, and we decline to revisit the issue in any great detail.

In *Ballard*, this court noted that "[t]he second stage of Illinois capital sentencing proceedings clearly bears a marked resemblance to the balancing of factors in which trial courts traditionally engage in determining what sentence to impose within a statutory range, a practice of which *Apprendi* explicitly approved. *Apprendi*, 530 U.S.

at 481, 147 L. Ed. 2d at 449-50, 120 S. Ct. at 2358." *Ballard*, 206 Ill. 2d at 204. In *Mertz*, we stated:

> "If the weighing of factors in the second stage of capital sentencing were to be considered a factual finding, one would logically have to conclude that standard sentencing procedures undertaken daily by hundreds of courts across this state also partake of fact-finding which would fall within the purview of *Apprendi*. We reject that notion. See also *Davis*, 205 Ill. 2d at 375 (*Apprendi* does not apply to the consideration of mitigating and nonstatutory aggravating factors at the second stage of capital sentencing, because consideration of those factors 'cannot increase the penalty for the crime' beyond the statutory maximum of death established at the conclusion of the eligibility phase)." *Mertz*, 218 Ill. 2d at 93-94.

In *Ring*, the constitutional infirmity noted by the Supreme Court was that the Arizona death penalty statute removed the right to have a *jury* make the determination of facts required to establish the defendant's eligibility for a death sentence–specifically, the finding of aggravating factors. *Ring*, 536 U.S. at 597, 153 L. Ed. 2d at 569, 122 S. Ct. at 2437. In contrast, Illinois' death penalty procedure honors a defendant's right to have a jury at all stages of the sentencing proceeding. But with respect to the issue defendant raises here, we note that *Ring* only discussed the extension of *Apprendi*'s reasonable doubt standard to the finding of an aggravating factor necessary for the imposition of the death penalty. *Ring*, 536 U.S. at 597, 153 L. Ed. 2d at 569, 122 S. Ct. at 2437. *Ring* specifically noted that the defendant there was not making a claim with respect to mitigating circumstances and that *Apprendi* had drawn a distinction between facts in aggravation and facts in mitigation. See *Ballard*, 206 Ill. 2d at 204. This suggests that an *Apprendi* challenge would be unsuccessful if raised in a mitigating-factor context like the present case. *Ballard*, 206 Ill. 2d at 204-05. We further note that in the wake of *Ring*, the Arizona statutory scheme has been amended to provide for essentially the same death penalty procedure employed by Illinois. See Ariz. Rev. Stat. §13–703 (LexisNexis 2005). Consistent with our previous holdings, we conclude that the rules announced in *Apprendi* and *Ring* are not applicable to the second phase of a death penalty proceeding in Illinois because the trier of fact has already found beyond a

reasonable doubt the necessary aggravating factor for imposition of the death penalty and therefore cannot increase the penalty beyond the statutory maximum of death.

Defendant's final argument is that "Illinois' death penalty is arbitrarily applied, based on race, geography, procedural evolution, discretion and mistakes of fact." We rejected the identical argument in *Mertz*. See *Mertz*, 218 Ill. 2d at 95-98. Thus, we need not consider it further other than to mention that defendant does not argue that race, geography, procedural evolution or prosecutorial discretion actually played a part in the decision to seek the death penalty in *his* case, or in the court's decision to impose it on *him*. Finally, we are confident that the discretion exercised in defendant's case was not exercised in an arbitrary and capricious manner.

### CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Stark County is affirmed. We direct the clerk of this court to enter an order setting September 12, 2006, as the date on which the sentence of death, entered by the circuit court of Stark County, shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 2004). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is confined.

*Affirmed.*

JUSTICE KILBRIDE took no part in the consideration or decision of this case.

JUSTICE FITZGERALD, specially concurring:

Based on the facts and the evidence presented at the sentencing hearing, I agree with the majority that the trial court's imposition of the death penalty in this case was appropriate and not fundamentally unjust. I write separately because I believe that, while the majority reached the correct decision, it did not apply the proper standard of review.

˘41˘

The majority advocates a standard of review which is neither "pure abuse of discretion nor a pure *de novo* standard." Slip op. at 24. This standard is derived from the principle that, in death penalty cases, this court should give some deference to the fact and credibility determinations of the fact finder, while at the same time subjecting the record to intense scrutiny. I agree that the fact finder's assessment of the evidence and credibility of the witnesses is entitled to some deference. I likewise agree that, because of the seriousness of death penalty proceedings, the record should certainly be subject to "intense scrutiny." However, I do not believe that the fashioning of a standard of review that falls somewhere between abuse of discretion and *de novo* is necessary or sufficient to achieve these goals.

The legislature of this state has assigned to this court the duty, "independent of any procedural grounds for relief," to "overturn the death sentence, and order the imposition of imprisonment *** if the court finds that the death sentence is fundamentally unjust as applied to the particular case." 720 ILCS 5/9–1(i) (West 2004). This is a great responsibility. Indeed, this court must answer the ultimate question of whether a defendant should receive a death sentence. Because of the seriousness of the issue, and the fact that the decision, in the end, is ours alone to make, our review should be *de novo*.

This court has previously adopted a *de novo* standard of review when charged with deciding the "ultimate question" of whether a criminal defendant's confession is voluntary. *In re G.O.*, 191 Ill. 2d 37, 50 (2000). In *G.O.*, we stated that we would "accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence. However, we will review *de novo* the ultimate question of whether the confession was voluntary." *G.O.*, 191 Ill. 2d at 50. In reaching this conclusion, we relied on the Seventh Circuit's opinion in *United States v. D.F.*, 115 F.3d 413 (7th Cir. 1997), which was rooted in the United States Supreme Court's opinion in *Ornelas v. United States*, 517 U.S. 690, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996).

In *Ornelas*, the Supreme Court recognized the need for *de novo*, or "independent appellate review," of the "ultimate determinations" of reasonable suspicion and probable cause. *Ornelas*, 517 U.S. at 697, 134 L. Ed. 2d at 919, 116 S. Ct. at 1662. In *D.F.*, the Seventh Circuit

advocated *de novo*, or independent, review regarding the "ultimate question" of the voluntariness of a defendant's confession. *D.F.*, 115 F.3d at 419. It is significant that the *de novo* standard has been deemed appropriate in cases where extremely serious decisions must be made by reviewing courts–decisions involving fundamental rights that impact a person's liberty. See also *People v. Gonzalez*, 204 Ill. 2d 220, 223 (2003) (applying a *de novo* standard of review to the ultimate question of whether the defendant's motion to suppress was properly granted, where the defendant, a passenger in a vehicle stopped for a traffic violation, asserted that he was unreasonably seized in violation of the fourth amendment); *People v. Crane*, 195 Ill. 2d 42, 51-52 (2001) (applying a *de novo* standard to the "ultimate determination" of whether the defendant's constitutional right to a speedy trial was violated). The United States Supreme Court, the Seventh Circuit, and this court demonstrated a reluctance to apply a deferential standard of review under these grave circumstances. The same reluctance is appropriate here.

Yet, the weight of our decision is not the only factor which supports the application of the *de novo* standard. Drawing from the Supreme Court's reasoning in *Ornelas*, in *D.F.*, the Seventh Circuit pointed out that the question of voluntariness involved a consideration of the facts admitted at trial and assessed by the fact finder, but ultimately was a question of law. *D.F.*, 115 F.3d at 418. It likewise recognized that voluntariness is a fluid concept "given content through case-by-case adjudication," which required "uniformity of meaning and consistency of application." *D.F.*, 115 F.3d at 417. The court stated that reviewing courts must conduct an independent review under these circumstances in order to " 'maintain control of, and to clarify' the controlling legal principles." *D.F.*, 115 F.3d at 417, quoting *Ornelas*, 517 U.S. at 697, 134 L. Ed. 2d at 919, 116 S. Ct. at 1662.

The considerations made by the Seventh Circuit in *D.F.*, and adopted by this court in *G.O.*, are readily applicable to death penalty cases. As in determining voluntariness of a confession, when determining whether a sentence of death is appropriate, this court must consider the facts admitted into evidence and the trial court or jury's assessment of those facts. However, while this court should pay some deference to the fact finder's assessments, this court, by statute, is bound to determine the ultimate question of whether the facts

presented at trial are sufficient to warrant imposition of the death penalty, such that the death penalty is not fundamentally unjust as applied to a particular defendant. Like voluntariness, fundamental injustice is a fluid concept which can only be given content and meaning through application in case-specific situations. See *D.F.*, 115 F.3d at 417. This court cannot develop continuity and control over precedent in this area if we are not permitted to exercise a fully independent review of the facts and issues before us. Application of the standard of review fashioned by the majority would create varied and inconsistent results in death penalty cases. As the Supreme Court astutely recognized: "Such varied results would be inconsistent with the idea of a unitary system of law. This, if a matter-of-course, would be unacceptable." *Ornelas*, 517 U.S. at 697, 134 L. Ed. 2d at 919, 116 S. Ct. at 1662.

Furthermore, as the Supreme Court likewise recognized: "[o]ur capital punishment doctrine is rooted in the principle that ' "[t]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be ... wantonly and ... freakishly imposed.' " *Lewis v. Jeffers*, 497 U.S. 764, 774, 111 L. Ed. 2d 606, 618, 110 S. Ct. 3092, 3099 (1990), quoting *Gregg v. Georgia*, 428 U.S. 153, 188, 49 L. Ed. 2d 859, 883, 96 S. Ct. 2909, 2932 (1976), quoting *Furman v. Georgia*, 408 U.S. 238, 310, 33 L. Ed. 2d 346, 390, 92 S. Ct. 2726, 2763 (Stewart, J., concurring) (1972). Our legislature has attempted to guard against "wanton" and "freakish" imposition of the death penalty in this state by giving this court the authority to review each penalty of death for fundamental unfairness. This task is best undertaken by applying a *de novo* standard of review in deciding the "ultimate question" before us.


JUSTICE McMORROW, dissenting:

As part of the death penalty reforms enacted by the General Assembly in 2003 (see Pub. Act 93−605, eff. November 11, 2003), a new provision was added to section 9−1(i) of the Criminal Code of 1961 (720 ILCS 5/9−1(i) (West 2004)). This provision, often referred to as the fundamental justice amendment, places upon this court the responsibility to set aside a death sentence−even in the absence of any trial error−if the court determines that the death sentence is "fundamentally unjust." *People v. Mertz*, 218 Ill. 2d 1, 54 (2005). In

full, section 9–1(i) provides:

> "(i) Appellate Procedure.
>
> The conviction and sentence of death shall be subject to automatic review by the Supreme Court. Such review shall be in accordance with rules promulgated by the Supreme Court. The Illinois Supreme Court may overturn the death sentence, and order the imposition of imprisonment under Chapter V of the Unified Code of Corrections if the court finds that the death sentence is fundamentally unjust as applied to the particular case. If the Illinois Supreme Court finds that the death sentence is fundamentally unjust as applied to the particular case, independent of any procedural grounds for relief, the Illinois Supreme Court shall issue a written opinion explaining this finding." 720 ILCS 5/9–1(i) (West 2004).

State Senators Cullerton and Dillard, the co-sponsors of the legislation which introduced the fundamentally unjust standard, have explained the significance of this provision:

> "The fundamental justice amendment of [Public Act 93–605] is ground breaking in scope and conception. It is a result of deliberations beginning in the Capital Litigation Subcommittee of the Illinois Senate Judiciary Committee during the 92nd General Assembly and continuing through deliberations in the Senate Judiciary Committee during the 93rd General Assembly. This fundamental justice amendment authorizes the Supreme Court to engage, in death penalty cases only, in a new and important kind of appellate review. This new kind of appellate review is designed to be substantive, rather than procedural, focusing on the key substantive question: whether the death sentence is 'fundamentally just' as applied to the particular case.
>
> * * *
>
> The fundamental justice amendment contemplates that the new 'fundamental justice' appellate review–which is *not* the same as 'comparative proportionality review'–will be fact-based and highly discretionary, and will lead to appellate reversal on substantive grounds in only a very small number of death penalty cases. *** The 'fundamental justice' of a death sentence, as applied to a particular case, cannot

generally be determined on the basis of legal rules. It is a moral issue, not a legal one, and must be based on the facts of the particular case and the moral compass of the decision maker." (Emphasis in original.) J. Cullerton, K. Dillard & P. Baroni, *Capital Punishment Reform in Illinois–A Model for the Nation*, DCBA Brief, at 10-12 (April 2004).

See also R. Weisberg, *Apology, Legislation and Mercy*, 82 N.C. L. Rev. 1415, 1438 (2004) (the fundamental justice amendment "enables appellate [*sic*] judges to grant mercy to otherwise properly sentenced capital defendants because, in the view of the appellate [*sic*] court, the technical and procedural rules by which they were supposed to monitor capital sentencing could not capture the moral concerns that society demands").

Professor Joseph Hoffmann, the individual who initially proposed the fundamental justice provision (see 93d Ill. Gen. Assem., Senate Proceedings, November 5, 2003, at 43), has explained that the fundamental justice of a death sentence is distinct from whether that sentence is excessive:

"After surveying the history of both guilt-innocence and 'excessiveness' review in Illinois capital cases, *** I believe that both grants of authority generally have been construed quite narrowly–in sharp contrast to the broad, open-ended authority contemplated by the FJA [fundamental justice amendment].*** The FJA–at a bare minimum–should serve as a clear and influential statement, by an overwhelming, bi-partisan majority of the Illinois Legislature, that such substantive review is both desirable and wholly consistent with legislative intent. The FJA thus should eliminate any concerns that the exercise of substantive appellate review authority by the Illinois Supreme Court is illegitimate, or contrary to the will of the people of Illinois, as expressed by the Illinois Legislature." J. Hoffman, *Protecting the Innocent: The Massachusetts Governor's Council Report*, 95 J. Crim. L. & Criminology 561, 577 n.83 (2005).

See also DCBA Brief, at 12 (distinguishing the fundamental justice inquiry from the excessiveness inquiry and noting that under the fundamental justice amendment, all issues that might relate to the fundamental justice of a death sentence may be considered by this

court).

The fundamental justice determination differs from the traditional appellate review conducted in death penalty cases. Section 9–1(i) directs this court to determine the fundamental justice of the death sentence in the first instance, when the case is on direct appeal to this court. The fundamental justice inquiry is not conducted in the circuit court and the circuit court enters no finding regarding the fundamental justice of the death sentence. Thus, while this court must give deference to any findings of fact made by the circuit court during trial and sentencing, principles of deference and standards of review do not play a role in the fundamental justice determination itself–they simply are not relevant. Stated otherwise, section 9–1(i) authorizes this court, in every death penalty case, to conduct an independent evaluation of the facts of record, as established in the circuit court, and determine whether the imposition of the death penalty is "fundamentally unjust," even when the defendant has been "otherwise properly sentenced" (82 N.C. L. Rev. at 1437-38). Applying that standard here, I conclude that the imposition of the death penalty would be fundamentally unjust in this case.

A principal reason why imposing the death penalty would be fundamentally unjust in this case is defendant's mental condition. There is no dispute that the defendant was suffering from a mental disorder at the time of the offenses he committed. All three experts who testified at trial so stated. The only dispute is with regard to the type of disorder, *i.e.*, whether defendant suffers from a delusional disorder of the persecutory type, found by defense witnesses, Drs. Day and Chapman, or a paranoid personality disorder, found by Day and the State's witness, Dr. Kowalkowski. Further, as the majority notes, defendant's belligerent actions following his arrest and during trial were completely irrational, given that he was facing a possible death sentence. See slip op. at 33. This point underscores the fact that defendant's mental processes do not function in a normal fashion.

In addition, defendant does not have a significant prior criminal history. At the time of the murders in this case, defendant was 60 years old. His prior criminal history consisted of only four misdemeanor convictions–two for disorderly conduct, one for reckless driving, and one Class C misdemeanor assault. Defendant had no felony convictions of any type. Defendant was not an

incorrigible felon with an extensive criminal history. Indeed, as the majority notes, the murders defendant committed "were uniquely extreme in terms of defendant's past conduct." Slip op. at 37.

Moreover, the record contains numerous examples of defendant's positive attributes. For most of his adult life, defendant worked and supported his wife and three children. He provided each child with a college education and helped raise them to become productive citizens. Further, throughout his life, defendant often engaged in acts of generosity toward others. Among other things, defendant rushed to the aid of neighbors when they lost their home in a fire, returned a borrowed tractor in the middle of a heavy snowstorm because he thought the owner might need it to plow snow, installed a wood-burning stove in the house of another neighbor who had no heat, asking for nothing in return, and repaired that neighbor's roof without being asked. At the death penalty hearing, several persons testified on defendant's behalf, describing defendant as "a good, dependable worker," a "good father," a "good friend," and "the nicest guy you would ever want to meet." In my view, this evidence demonstrates that the crimes committed by defendant were aberrant events fueled by his unstable mental condition.

Finally, as defense counsel has noted, defendant is now 63 years old, largely deaf, and in poor health. And, while defendant was verbally abusive when in custody during trial, the only physical action he took was clogging a toilet. Defendant has never physically assaulted any prisoner or prison official. Compare, *e.g.*, *People v. Easley*, 192 Ill. 2d 307, 333-34 (2000) (defendant's repeated attacks on prison officials used as aggravating evidence). Defendant does not pose so serious a safety risk in prison that execution is the only means of protecting other inmates and prison officials. Incarceration in prison for the remainder of his life without the possibility of parole or mandatory supervised release is an alternative that will both protect the public and punish defendant.

The seriousness of defendant's offenses cannot be overstated. The crimes he committed were unquestionably horrific. However, in the exercise of discretion afforded this court under section 9–1(i), I must conclude that the imposition of the death sentence in this case is fundamentally unjust. I note that in reaching this conclusion, my decision is informed by familiar principles:

"It is this court's 'responsibility in every death penalty case to carefully consider the character of the defendant and the circumstances of his crime before we sanction the termination of his life.' *People v. Tye*, 141 Ill. 2d 1, 37 (1990) (Ryan, J., concurring in part and dissenting in part). In fulfilling this responsibility, we are 'guided by the recognition that "each capital case is unique and must be evaluated on its own facts, focusing on whether the circumstances of the crime and the character of the defendant are such that the deterrent and retributive functions of the ultimate sanction will be served by imposing the death penalty." [Citation.]' *People v. Smith*, 177 Ill. 2d 53, 98. ***

*** Anytime a human being unjustifiably takes the life of another, a civilized society should be horrified. '[C]apital punishment is an expression of society's moral outrage at particularly offensive conduct.' *Gregg v. Georgia*, 428 U.S. 153, 183, 49 L. Ed. 2d 859, 880, 96 S. Ct. 2909, 2930 (1976) (opinion of Stewart, Powell, and Stevens, JJ.). Nevertheless, our society and laws do not sanction the death penalty for *all* crimes which may shock a civilized society. Instead, we reserve it for those 'crimes [which] are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death.' *Gregg*, 428 U.S. at 184, 49 L. Ed. 2d at 881, 96 S. Ct. at 2930 (opinion of Stewart, Powell, and Stevens, JJ.)." *People v. Harris*, 182 Ill. 2d 114, 165-66 (1998) (McMorrow, J., concurring in part and dissenting in part).

The appropriate sentence in this case is life imprisonment without the possibility of parole or mandatory supervised release. Accordingly, I respectfully dissent.