**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 160241-U

Order filed July 24, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-16-0241 Circuit No. 11-CF-171 |
| | ) | |
| DEVANTAE L. JORDAN, | ) ) | The Honorable John P. Vespa, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CARTER delivered the judgment of the court.
Justices Holdridge and Wright concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  The record does not indicate defendant was denied a fair sentencing hearing where the 21-year-old defendant's sentence of 70 years of imprisonment was not facially unconstitutional in violation of the eighth amendment and where the sentencing court was not under a misapprehension as to defendant's age at the time of the offense or the applicable sentencing range. Additionally, the sentencing court's error of imposing concurrent sentences, rather than mandatory consecutive sentences, did not affect its determination to impose a 70-year sentence of imprisonment for first-degree murder.

¶ 2     Following a jury trial, defendant, Devantae L. Jordan, was convicted of first-degree

murder (720 ILCS 5/9-1(a)(2) (West 2010)) and mob action (720 ILCS 5/25-1(a)(1) (West

2010)) and was sentenced to 75 years and 1 year of imprisonment, respectively, to be served concurrently. On appeal, this court affirmed the jury's findings of guilt, vacated defendant's sentence, and remanded for resentencing by a different sentencing judge. *People v. Jordan*, 2014 IL App (3d) 120439-U, ¶¶ 43-44. On remand, defendant was sentenced to concurrent terms of imprisonment of 70 years for first-degree murder and one year for mob action. Defendant appeals, arguing that his 70-year term of imprisonment for first-degree murder should be vacated and this cause remanded for a new sentencing hearing because he did not receive a fair sentencing hearing. We affirm.

¶ 3                                             I. BACKGROUND

¶ 4        Defendant was charged with four counts of first-degree murder and one count of mob action. *Id.* ¶ 4. The charging instrument listed defendant's date of birth as December 17, 1988. The charges against defendant stemmed from an incident that occurred on June 24, 2010, during which defendant and the two male codefendants were alleged to have beaten the victim, Adrian Ortega, and defendant was alleged to have then shot and killed Ortega. *Id.* Defendant was 21½ years old on the day of Ortega's murder.

¶ 5        Evidence at defendant's trial indicated that Brittany Dirst was directed by defendant to drive him and the two codefendants to Ortega's location. *Id.* ¶¶ 10-14. Defendant and the two codefendants got out of the car, argued with Ortega, and beat Ortega; then there was gunfire. *Id.* ¶¶ 12, 14, 18. In a prior police interview (allowed into evidence as both impeachment and substantive evidence), one codefendant had stated that he could not remember how Ortega ended up on the ground but described Ortega as having his hands over his head saying, "no, no," prior to being shot in the head by defendant. *Id.* ¶¶ 18, 38. When defendant returned to Dirst's vehicle, he indicated that he had shot Ortega in the head. *Id.* ¶¶ 12, 14.

¶ 6    The jury found defendant guilty of first-degree murder and of mob action. *Id.* ¶ 21. The jury also found that the State had proven the allegation that during the commission of the offense of first-degree murder the defendant, or one for whose conduct he was legally responsible for, was armed with a firearm. The jury, however, was deadlocked regarding whether the State had proven the allegation that during the commission of the offense of first-degree murder the defendant personally discharged a firearm that proximately caused death to another person, and no verdict form was signed by the jury regarding that allegation. Defendant was sentenced to concurrent terms of imprisonment of 75 years for first-degree murder and 1 year for mob action.

¶ 7    On direct appeal, in reviewing the original sentencing hearing, this court noted "the trial court looked at the use of a gun in commission of the offense and sentenced [defendant] to what in essence [was] life in prison." *Id.* ¶ 43. This court noted that it had previously found the same sentencing court had a personal policy of sentencing defendants who used a firearm to *de facto* life sentences. *Id.* (citing *People v. Thomas*, 2014 IL App (3d) 120461 (noting the trial court's statement that "if you're man enough to pull the trigger, you're going to be man enough to do life in prison")).

¶ 8    At the original sentencing hearing in this case, the same sentencing judge stated, in part:

"I have said it before, and I am going to keep saying it, if you bring a gun to the fight, you're going to prison; and if you're responsible for that gun being fired, either because of you or somebody you['re] with, and you're man enough to have that gun fired and a life is taken, you're going to have to be man enough to spend the rest of your life in prison because that's the line in the sand."

¶ 9    This court found the sentencing court's comments were indicative of a personal policy of sentencing defendants with an applicable firearm enhancement to a term of imprisonment that

3

would ensure the defendant spent the rest of his natural life in prison. *Id.* ¶ 44. This court affirmed the jury findings of defendant's guilt but vacated defendant's sentence and remanded for resentencing by a different judge. *Id.* ¶ 45.

¶ 10    On remand, the new sentencing judge ordered a presentence investigation (PSI) report.[1] A new sentencing hearing took place on January 22, 2016. Defendant was 27 years old at that time.

¶ 11    At the resentencing hearing, the sentencing judge confirmed that both parties had received "the presentence investigation." The attorney for the State informed the sentencing judge that due to the jury's finding that a firearm had been used during the offense, the sentencing range for the first-degree murder charge was enhanced to 35 to 75 years of imprisonment, which included a 15-year firearm enhancement. The sentencing judge questioned whether the 25-year sentencing enhancement for personally discharging a firearm was applicable, and the parties indicated that the jury had not found that the State had proven defendant personally discharged the firearm.

¶ 12    At the sentencing hearing, defendant called three witnesses in mitigation. Cherish Coleman testified that that she had known defendant since 2009, and he was the father of their four-year-old daughter. Defendant had been incarcerated since Cherish was one month pregnant with their daughter. Defendant provided Cherish with $35 per month in child support during his incarceration. Their daughter visited defendant in prison on multiple occasions. Defendant sent their daughter letters and birthday cards. Cherish described defendant as a good person.

---

[1] Although the original PSI report is contained in the record on appeal, the record on appeal does not contain a subsequent PSI report.

4

¶ 13 Paul Hightower testified that he and defendant's grandmother were a couple when defendant was young. Hightower helped raised defendant from the time defendant was a one-year-old until defendant was about seven years old. Hightower was not aware that defendant did not finish high school because he was not in defendant's life at that point. Hightower was not familiar with the circumstances surrounding defendant having disciplinary issues in high school.

¶ 14 Defendant's grandmother testified that defendant had lived with her for his whole life. Defendant and his friends never caused any problems at her home. Prior to his incarceration, defendant had his first job at age 17 or 18. He worked at "G&D" and at a waterpark. Defendant's grandmother did not know why defendant stopped attending high school. She knew that defendant had been "kicked out" of high school a couple of times. Defendant's grandmother described defendant as helpful, respectful, and an "A, B, and C" student while he was in school. She testified that defendant would help in the community, she loved defendant, and defendant was a good person.

¶ 15 Defendant also submitted a letter from the GED director of the Peoria County jail. In the letter, the director indicated that defendant attended GED classes whenever class was in session and actively participated in the class. Defendant passed his Constitution test, which is a requirement for obtaining a GED.

¶ 16 In reviewing the statutory factors in mitigation, the attorney for the State agreed that defendant did not have a criminal history but noted that defendant had received three disciplinary tickets while incarcerated. The attorney for the State indicated that the codefendants had testified at trial that defendant brought the gun on the day of the murder. Upon arriving at the victim's home, defendant pulled out the gun prior to the altercation with the victim. The attorney for the state argued that the evidence at trial showed that one of the codefendant had asked defendant to

5

just "rough up" the victim a little bit and told defendant that he did not need to shoot the victim. The other codefendant had testified that the victim was on the ground, defenseless, with no ability to do anything to defendant. The coroner had testified that the victim was shot at nearly point-blank range in the back of the head execution style. The attorney for the State argued the defendant was cold and callous in the manner in which he murdered Ortega (shooting Ortega at nearly point-blank range in the back of the head, despite Ortega being in a defenseless position on the ground, covering his head, and begging for his life), so there was no indication of a strong provocation. The attorney for the State also argued that defendant initiated the action of going to the victim's home, there was no evidence that anyone other than defendant was the leader, and the murder had not occurred spontaneously. The attorney for the State further argued that defendant had been incarcerated prior to his daughter's birth and defendant's incarceration would not be an excessive hardship to his daughter or to his daughter's mother. The attorney for the State additionally indicated there were no applicable aggravating factors because the seriousness of the crime was already incorporated into the sentencing range, except for the aggravating factor of the need to deter others. The attorney for the State requested a sentence "much closer to 60 than 20" years of imprisonment (prior to the 15-year enhancement), "something in excess of the middle with a 15-year-mandatory gun enhancement added onto that."

¶ 17        Defendant's attorney reminded the court that the jury did not find that defendant was personally responsible for discharging the firearm and that defendant was maintaining that he did not fire the weapon. Defendant's attorney also noted that defendant had obtained his GED, lacked a criminal background, and had family support. Defendant's attorney asked the sentencing judge to consider that "a 100% sentence on murder cases, particularly when the enhancement applies, becomes a *de facto* life sentence imposed on a young man without regard

6

to the possibility of being rehabilitated." Defendant's attorney did not reference defendant's specific age of 21½ years old at the time of the murder or defendant's age of 27 years old at the time of resentencing. Defendant's attorney requested that the sentencing judge find that the minimum sentence was "more than sufficient" in relation to the seriousness of the offense and the objective of restoring defendant to useful citizenship.

¶ 18    In making a statement in allocution, defendant acknowledged that apologizing for what had happened was not good enough but indicated that he knew he was "not the murderer of Adrian Ortega." Defendant apologized directly to Ortega's family for what had happened. He also stated that he was only guilty of not calling the police and that he did not pull a gun on Ortega. Defendant asked for the sentencing judge to have mercy on him.

¶ 19    In a victim impact letter, Ortega's mother indicated her heart was full of pain and that her child had been beaten and shot in the head within 15 minutes of her last seeing him. Ortega's mother indicated that since her son's murder she wanted to give up on life so many times. She missed speaking with her son. She stated that her son had told her that he was going to be the best dad because his dad was not in his life, but now he would not get the chance to be a dad and she would never get the chance to be a grandmother to his children. Ortega's mother stated that she cannot talk to her son, hug him, or tell him that she loved him because another young man took his life. Ortega's mother indicated that the past five years had not been the best for her and her other two children, and her son's death had taken a toll on their lives.

¶ 20    In a victim impact letter, Ortega's sister indicated that her brother was executed by defendant and words could not express the pain and anguish endured by Ortega's family and friends since his death. She indicated that because of defendant's decision to take her brother's life, her brother was not there to walk his mother down the aisle on her wedding day, for the

birth of his first niece, or to celebrate his niece's first birthday. Ortega's sister described the loss of her brother as "beyond words" and described her family as "forever broken to say the least." Ortega's sister indicated that their mother lost her job because she could not return to work and lost her home where the murder took place. Ortega's sister indicated that it was the request of Ortega's family that defendant's sentence remain the same.

¶ 21    In a victim impact letter, Ortega's cousin indicated that Ortega was like a brother to her and that they had been inseparable. She described Ortega as compassionate, loving, and forgiving, and as a person who found the good and positive in everything and everyone. She indicated that on the night of his murder, Ortega had just finished eating dinner with his mother and was cleaning his mother's vehicle in the back of his mother's home. Ortega was 19 years old. Ortega's cousin requested defendant again be sentenced to 75 years of imprisonment for Ortega's murder.

¶ 22    In a victim impact letter, Ortega's grandmother indicated that Ortega had seen his mother struggle to "make it" and wanted to help her, but he would not get the chance to do so. Ortega's grandmother indicated that Ortega's mother had been severely depressed since the death of her son and attempted to kill herself at one point. Ortega's grandmother wanted to obtain justice for her grandson.

¶ 23    The sentencing judge stated the only factor he found in mitigation was defendant's lack of a criminal history and indicated the sentence he was going to impose was necessary to deter others. The sentencing judge also indicated that he found the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. The sentencing judge then clarified that the sentence he was about to impose "ha[d] nothing to do with [his] finding of— that the offense was accompanied by exceptionally brutal behavior indicative of wanton cruelty."

8

The sentencing judge stated that if he did not make that finding he would give defendant the sentence he was about to impose and clarified that defendant was "getting nothing additional by virtue of that finding." The sentencing judge sentenced defendant to 55 years of imprisonment plus the additional mandatory 15-year firearm enhancement (a total of 70 years of imprisonment) for murder, with a concurrent 1-year term of imprisonment for mob action.

¶ 24　　　　Upon a request for clarification from the defendant's attorney, the sentencing judge confirmed that he found the offense was accompanied by exceptionally brutal and heinous behavior but did not "act" on that finding, noting the sentence was within the applicable sentencing range without such a finding. After some discussion with the parties' attorneys regarding the way the sentencing judge's statements could be interpreted on appeal, the sentencing judge pronounced that he was changing what he had previously said, stating "I'm not going to find this was accompanied by exceptionally brutal behavior indicative of wanton cruelty." The sentencing judge indicated that the applicable statutory factor he found in aggravation was that the sentence imposed was necessary to deter others from committing the same crime.

¶ 25　　　　Defendant filed a motion to reconsider, arguing that the sentencing judge failed to "accord proper weight to the defendant's youth and rehabilitative potential." Defendant further argued that he believed that the sentence that had been imposed "manifested" the sentencing court's finding, although subsequently retracted, that the offense was accompanied by brutal or heinous behavior indicative of wanton cruelty, rendering defendant eligible for "an excessive '*de facto* life' sentence." Defendant further argued the finding that his behavior was brutal or heinous was not supported by the evidence. Defendant contended that the sentence of 70 years of imprisonment for murder was excessive and an abuse of discretion where his behavior did not

9

support a brutal and heinous finding, he was not proven beyond a reasonable doubt to have had personally discharged the firearm that caused Ortega's death, the sentencing court accepted his expression of remorse, and there was no proof of premeditation or intentionally torturous conduct.

¶ 26    At the hearing on defendant's motion to reconsider on April 29, 2016, defendant argued that a 70-year sentence to "a 23-year-old man" was a *de facto* life sentence. Defendant's attorney argued "the current trend in the law" was to "take a good, hard look at the imposition of life sentences to mandatory or discretionary individuals whose youth still garners and still projects the ability or the possibility of rehabilitation, which, of course, is one of the factors the Court must consider in rendering a fair and just sentence under our Constitution." Defendant's attorney also argued the sentencing court's initial finding of brutal or heinous behavior, although retracted, must have influenced the sentence imposed. Defendant's attorney noted that defendant had no history of violence and there was doubt as to whether he was the actual triggerman where the jury did not find him to have personally discharged the weapon. The sentencing judge questioned whether there had been any testimony at trial indicating that someone other than defendant had discharged the firearm. Defendant's attorney confirmed that there had been no evidence that anyone else fired the weapon. Defendant's attorney reiterated his argument that the trial court failed to consider defendant's potential for rehabilitation "as it complies and comports with the factor of youth" and requested that the sentencing judge reconsider its imposition of the "*de facto* life sentence."

¶ 27    The attorney for the State argued, *inter alia*, that while defendant was a young offender, he was not a juvenile offender. The attorney for the State argued that the sentencing court had considered defendant's youth in mitigation. The attorney for the State also disagreed with the

10

sentencing judge's finding that defendant was remorseful where defendant had not accepted accountability for his actions, contending defendant did not show the type of remorse indicative of a potential for rehabilitation.

¶ 28    The sentencing judge indicated that the finding of brutal or heinous behavior was not weighed into defendant's sentence. He stated, "I took it back." He indicated it was a misstatement that he had taken back in the same hearing and stated that the finding had not been used in determining defendant's sentence. The sentencing judge further stated:

> "I went down a path I should not have. I'm going to say for the second time, I'm sorry. Am I ever sorry I did, but that did not have, like I specifically said, was not a factor in my determination of the sentencing amount.

> So when I later took back that finding of extended term applicability, it did not follow at all that now I had to lower the sentence because for the third time during what I'm saying right now I specifically said that finding is not being used when I determine the sentencing amount."

¶ 29    The sentencing court indicated that it had found that defendant was remorseful for his actions on the day of the murder. The sentencing court stated, "the presentence investigation [PSI report] says the defendant is 26 years old."[2] The sentencing judge indicated that defendant's argument of mitigation based on defendant's youth was not applicable. The sentencing judge indicated that he did not feel defendant's argument that a judge should sentence a defendant toward the lower end merely because the offender's younger age was correct. He noted "obviously, [a] 14-year-old is not through forming his way he's going to be as a functioning

---

[2] The PSI report indicated that defendant was born on December 17, 1988.

11

adult, but 26, now, can we start having some expectations of people at 26? I think the answer is, yes." The sentencing court reviewed the evidence that Ortega had been beaten by defendant and the two codefendants and that defendant had pulled out a gun, stating that after Ortega was beaten "mercilessly," he was on the ground curled up in a fetal position, [saw] the gun, scream[ed], "please, please, don't" or words to the effect of please have mercy on me, and then he was shot in his skull. The sentencing judge indicated that he had considered "what happened in this specific offense" and denied defendant's motion to reconsider.

¶ 30    Defendant appealed.

¶ 31                                    II. ANALYSIS

¶ 32    On appeal, defendant argues his 70-year prison sentence for first-degree murder should be vacated and this cause remanded for a new sentencing hearing. Defendant argues that he did not receive a fair sentencing hearing because the sentencing judge and the parties misunderstood the relevant law and applicable facts. Specifically, defendant argues the trial court: (1) did not understand defendant was not subject to an extended-term sentence based on exceptionally brutal or heinous behavior indicative of wanton cruelty; (2) misunderstood which firearm enhancement was applicable in this case; (3) did not know defendant was 21 years old at the time of the offense; and (4) did not know that a murder conviction involving multiple offenses triggered a mandatory imposition of consecutive sentences. Defendant requests that this case be remanded for resentencing. The state contends there were no errors made by the sentencing judge in this case that warrant vacating defendant's sentence and remanding for a new sentencing hearing.

¶ 33    Defendant contends his claims "were not preserved." He argues, however, that this court should review his claims under the plain error doctrine because the sentencing court's errors were so fundamental that it denied him a fair sentencing hearing. In the alternative, he argues his

12

counsel rendered ineffective assistance by failing to preserve the claims for review. Defendant contends his counsel's performance was deficient for failing to inform the sentencing court that he was not extended-term eligible on the basis of an exceptionally brutal and heinous finding and by failing to correct the trial court's mistake about his age at the time of the offense. Defendant argues he was prejudiced by his counsel's deficient performance because "there is at least a reasonable probability that the court would have imposed a shorter sentence for the murder."

¶ 34   In general, a defendant preserves a sentencing issue for review by objecting to the issue at the sentencing hearing and including it in a written motion to reconsider the sentence, otherwise the issue is considered forfeited. *People v. Ballard*, 206 Ill. 2d 151, 192 (2002); *People v. Enoch*, 122 Ill. 2d 176, 186-87 (1988) (the failure to object to an alleged error at trial and raise the issue in a posttrial motion ordinarily results in the forfeiture of the issue on appeal). However, Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) provides: "any error, defect irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." In order to determine whether the plain error doctrine should be applied, we must first determine whether any error occurred. *People v. Herron*, 215 Ill. 2d 167, 187 (2005).

¶ 35                    A. Exceptionally Brutal and Heinous Finding

¶ 36   Defendant first argues that the record reveals that the sentencing court and the parties did not understand the maximum applicable sentence because the sentencing court believed it could make an exceptionally brutal and heinous finding subjecting defendant to a maximum extended-term sentence of up to 115 years (rather than 75 years). Defendant argues that a jury must make such a finding beyond a reasonable doubt, in accordance with *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), wherein the United States Supreme Court held that other than the fact of a prior

13

conviction, any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury and proven beyond a reasonable doubt. The State concurs with defendant's argument in this regard but argues that defendant was not sentenced to an extended term based on a finding of exceptionally brutal behavior.

¶ 37 Here, the record shows that defendant's sentence was not impacted in relation to an exceptionally brutal and heinous finding by the sentencing judge. In fact, the record is clear that any such finding made by the sentencing judge was retracted, meaning there was no such finding. The sentencing judge also specifically indicated no weight had been attributed to that retracted finding. Furthermore, at the hearing on defendant's motion to reconsider, the sentencing judge again indicated the retracted finding was not a factor in the sentencing determination. The record also shows that the sentencing judge knew the applicable sentencing range was 35 to 75 years of imprisonment (with the 15-year sentencing firearm enhancement included therein). Therefore, contrary to defendant's contention, the record does not show the trial court acted under a misunderstanding of the applicable maximum sentence.

¶ 38                                    B. Applicable Firearm Enhancement

¶ 39 Defendant additionally argues that the record shows that the sentencing court did not understand which firearm enhancement applied in this case. While it is true that the sentencing court asked whether the 25-year sentencing enhancement for the personal discharge of a firearm that caused the death of another person was applicable (pursuant to section 5-8-1(a)(1)(d)(iii) of the Unified Code of Correction (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2010))), the sentencing judge was informed that it was not applicable. There is no indication of a misunderstanding that the 25-year enhancement was applicable, and it is clear from the record that the 15-year firearm enhancement was applied in this case. Therefore, contrary to defendant's contention, the record

14

does not show that the sentencing court relied on inaccurate information and a misapprehension of the law regarding which firearm enhancement was applicable.

¶ 40                                 C. Mandatory Consecutive Sentences

¶ 41        Defendant contends, and the State agrees, that the sentencing court erroneously imposed a concurrent one-year sentence for mob action, rather than imposing statutorily mandated consecutive sentences.[3] See 730 ILCS 5/5-8-4(a)(i) (West 2010) (providing that consecutive sentences "shall be imposed" if one of the offenses for which defendant was convicted was first degree murder (or a Class X or Class 1 felony) and the defendant inflicted severe bodily injury). Defendant claims that this error underscores his argument that his sentence was not based upon a proper understanding of the applicable law. Contrary to defendant's contention, this sentencing error did not deprive defendant of a fair sentencing hearing where there is no indication that the sentencing court relied on this error when determining defendant's 70-year sentence for first-degree murder. See *People v. Myrieckes*, 315 Ill. App. 3d 478, 483-84 (2000) (in determining whether a mistaken belief influenced a sentencing decision a reviewing court looks to whether the trial court's comments demonstrate its reliance on a mistaken belief or used the mistaken belief as a reference point in fashioning the sentence).

¶ 42                        D. Consideration of Defendant's Youth in Mitigation

¶ 43        Defendant next argues he was 21 years old at the time of the murder and the sentencing court erred by declining to consider his youth in mitigation based on its mistaken belief that defendant was 26 years old at the time of the murder. Defendant further argues that the

---

[3] The State concedes that this error by the sentencing court is not reviewable in this appeal. See *People v. Castleberry*, 2015 IL 116916, ¶¶ 20-24 (in the absence of the void sentence rule, the State may not directly attack the trial court's sentencing order).

sentencing court should have "considered his youth in mitigation before it impose[d] a *de facto* life sentence of 70 years."

¶ 44　At the resentencing hearing on remand, the sentencing judge had indicated that defendant was 26 years old. Contrary to defendant's contention, the sentencing judge did not indicate that defendant was 26 years old at the time of the murder. Our review of the record indicates that the sentencing judge's statement that defendant was 26 years old referred to defendant's age at the time of resentencing (he was 27 years old at the time of resentencing). Additionally, the record shows the sentencing judge reviewed the PSI report, which included defendant's date of birth, indicating the sentencing judge knew defendant was 21 years old at the time of the murder.

¶ 45　In support of his contention that the sentencing court erred by failing to consider his youth in mitigation, defendant cites to *Miller v. Alabama* in support of the proposition that the sentencing court improperly did not consider defendant's youth in mitigation before imposing the 70-year sentence for first-degree murder in this case. See *Miller v. Alabama*, 567 U.S. 460, 479-80 (2012) (holding the eighth amendment prohibits "a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders" and mandating that sentencing courts "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison"). Defendant also cites to this court's decision in *Smolley*, wherein this court remanded for resentencing where the trial court had failed to consider the 15-year-old defendant's youth, immaturity, and potential for rehabilitation before imposing a 65-year *de facto* life prison term. *People v. Smolley*, 2018 IL App (3d) 150577, ¶ 22.

¶ 46　Defendant argues the same considerations as those applicable for juvenile defendants (youth, immaturity, and potential for rehabilitation) should apply to 18 to 21 year old defendants, such as himself, based on research that the brain does not finish developing until a person's mid-

16

20s and that young adults are more similar to adolescents than mature adults, more susceptible to peer pressure, less future oriented, and more volatile in emotionally charged settings. Defendant argues that 18 to 21-year-old young-adults have a diminished capacity to understand the consequences of their actions and to control their behavior, similar to juvenile offenders. Despite not providing any evidence in the trial court regarding this contention, defendant argues that "under these principles" the sentencing court erred in refusing to consider his youth, immaturity, and potential for rehabilitation before imposing a *de facto* life sentence of 70 years of imprisonment for first-degree murder. The State argues that *Miller* is not applicable to 21-year-old offenders such as defendant.

¶ 47        The United States Constitution prohibits "cruel and unusual" punishment. U.S. Const., amend. VIII. "The Eighth Amendment's prohibition of cruel and unusual punishment 'guarantees individuals the right not to be subjected to excessive sanctions.' " *Miller v. Alabama*, 567 U.S. at 469 (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005)). In *Miller*, the United States Supreme Court held that the eighth amendment prohibits "a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller*, 567 U.S. at 479. Following *Miller*, the Illinois Supreme Court held, "a juvenile may not be sentenced to a mandatory, unsurvivable prison term without first considering in mitigation his youth, immaturity, and potential for rehabilitation." *People v. Reyes*, 2016 IL 119271, ¶ 8 (a mandatory term of imprisonment that cannot be served in one lifetime amounts to a *de facto* life sentence and has the same practical effect on a juvenile as that of an actual mandatory sentence of life without parole). Life sentences for juvenile defendants are disproportionate and violate the eighth amendment, "unless the trial court has considered youth and its attendant characteristics."

17

*People v. Holman*, 2017 IL 120655, ¶ 40 (holding that *Miller* also applies to discretionary sentences that amount to life without parole for juvenile defendants).

¶ 48 In 2016, the Illinois legislature added section 5-4.5-105 to the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105 (West 2016)), requiring sentencing judges to consider certain specified factors when a person commits an offense and the person is "under 18 years of age at the time of the commission of the offense." 730 ILCS 5/5–4.5-105(a) (West 2016) (requiring consideration of: the juvenile's age, impetuosity, level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior and any cognitive or developmental disabilities; whether the juvenile was subjected to outside pressure; the juvenile's family, home environment, education and social background, including any history of parental neglect, physical abuse, or other childhood trauma; potential for rehabilitation; circumstances of the offense; degree of participation and specific role in the offense, including the level of planning by the juvenile prior to the offense; whether the juvenile was able to meaningfully participate in his or her defense; prior juvenile or criminal history; and other information the court finds relevant and helpful, including an expression of remorse, if appropriate). When a sentencing court does not reference a juvenile's youth and its attendant characteristics when imposing a *de facto* life sentence, this court has held that a juvenile defendant is entitled to a new sentencing hearing where the factors of section 5-4.5-105 of the Code must be considered. See *Smolley*, 2018 IL App (3d) 150577, ¶ 22.

¶ 49 In this case, however, defendant was not a juvenile at the time of the offense. There is no dispute that defendant was an adult, who was 21 years old at the time he murdered Ortega. Accordingly, *Miller* does not apply to this case. See *People v. Harris*, 2018 IL 121932, ¶¶ 58-61 (declining to extend *Miller* to offenders who are 18 years of age or older; the *Miller* court

"confirmed that the age of 18 is the legal line separating adults from juveniles" so that the protections of *Miller* only apply to juvenile offenders); *People v. Ramsey*, 2019 IL App (3d) 160759, ¶ 22 (76-year sentence of imprisonment imposed upon 18-year-and-3-month-old defendant was not facially unconstitutional in violation of the eighth amendment prohibition against cruel and unusual punishment; declining to extend *Miller* to adults under the age of 21 and stating that the line between juveniles and adults remains at 18 year of age); *People v. Minniefield*, 2020 IL App (1st) 170541, ¶ 37 (rejecting a facial federal eighth amendment challenge to a life sentence for an offender over 18 years old but under 21 years old). "New research findings do not necessarily alter that traditional line between adults and juveniles." *Harris*, 2018 IL 121932 ¶ 60. Therefore, in so far as defendant makes a facial eighth amendment claim pursuant to *Miller*, we reject that claim.

¶ 50        Additionally, we presume that the sentencing court properly considered all mitigating evidence absent some indication otherwise. *People v. Thompson*, 222 Ill. 2d 1, 37 (2006) (we presume that the sentencing court considered all mitigating evidence absent some indication, other than the sentence itself, to the contrary). As discussed above, the record indicates the sentencing court knew defendant was 21 years old at the time of the offense when sentencing defendant to 70 years of imprisonment for first-degree murder. See *People v. Fern*, 189 Ill. 2d 48, 54 (1999) (a sentence within the applicable statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or if it is manifestly disproportionate to the nature of the offense).

¶ 51        In so far as defendant, on appeal, raises an as-applied constitutional challenge based on emerging science regarding juvenile maturity and brain development, the claim is premature. See *Harris*, 2018 IL 121932, ¶¶ 39, 41 (generally, "a reviewing court is not capable of making an as-

19

applied finding of unconstitutionality in the 'factual vacuum' created by the absence of an evidentiary hearing and findings of fact by the trial court"). In the trial court in this case, defendant generally argued that the sentencing judge failed to "accord proper weight to the defendant's youth and rehabilitative potential," a 70-year sentence to "a 23-year-old man" was a *de facto* life sentence, and the "the current trend in the law" was to "take a good, hard look" at the imposition of life sentences on individuals whose youth still garners and still projects the ability or the possibility of rehabilitation." However, defendant did not specifically raise an as-applied constitutional challenge in the trial court, resulting in no evidentiary hearing or findings of fact regarding defendant's specific circumstances. The record contains no evidence as to how the emerging science regarding juvenile maturity applies to a 21-year-old adult offender, such as defendant, or to the circumstances of defendant's case, and the record, including the PSI report, provides little information specifically about defendant. Therefore, the record is insufficient for this court to address an as-applied constitutional claim regarding defendant's sentence. See *id.*, ¶¶ 46-48 (concluding that the record was insufficient to allow appellate review of the 18-year-old defendant's as-applied constitutional challenge to his sentence under the proportional penalties clause of the Illinois Constitution, making the claim premature and more appropriate for another proceeding where evidence could be presented, such as a postconviction proceeding or proceeding pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2016)); *People v. Figueroa*, 2020 IL App (2d) 160650, ¶¶ 86-89 (declining to address an as-applied proportionate penalties clause challenge made by the defendant, who was 22 years old at the time of the offense, because the claim was premature); *but cf. People v. House*, 2019 IL App (1st) 110580-B, ¶¶ 4, 27, 32, 66, *appeal allowed*, No. 125124 (Ill. Jan. 29, 2020) (holding on direct appeal that the 19-year-old defendant's life sentences for double murder were

20

unconstitutional as applied, where the defendant was merely a lookout, was not present at the murder scene, did not plan the commission of the offenses, took orders from higher ranking gang members, and was convicted under a theory of accountability). "The critical point is not whether the claim is raised on collateral review or direct review, but whether the record has been developed sufficiently to address the defendant's constitutional claim." *Harris*, 2018 IL 121932, ¶ 41. Because the record in this case has not been sufficiently developed, an as-applied constitutional challenge raised by defendant in this appeal is premature.

¶ 52                                    III. CONCLUSION

¶ 53        The judgment of the circuit court of Peoria County is affirmed.

¶ 54        Affirmed.